**Affirmed as Modified and Opinion filed May 28, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-14-00059-CV

## RIVER OAKS L-M. INC. D/B/A WEST POINT LINCOLN MERCURY, Appellant/Cross-Appellee

### V.

## VERONICA VINTON-DUARTE, Appellee/Cross-Appellant

**On Appeal from the 269th District Court
Harris County, Texas
Trial Court Cause No. 2010-54452**

## O P I N I O N

An automobile dealership employee filed a sexual-harassment complaint; shortly thereafter, she was terminated for theft. The employee sued the dealership for sexual harassment, retaliatory discharge, and defamation. The dealership counterclaimed for theft, conversion, breach of fiduciary duty, and fraud. A jury found in favor of the employee on the sexual-harassment, retaliation, and defamation claims. The jury also found in favor of the automobile dealership on its

theft, conversion, breach of fiduciary duty, and fraud claims. The trial court granted judgment notwithstanding the verdict (JNOV) to the dealership on the employee's defamation claims, but otherwise signed a judgment on the jury's verdict.

On appeal, the automobile dealership asserts the evidence is legally insufficient to: (1) support a finding that "but for" the filing of the sexual-harassment complaint, the employee would not have been fired when she was; (2) show the dealership knew or should have known of the sexual harassment and failed to take prompt remedial measures; (3) support an award of attorney's fees; (4) support recovery of future lost earnings/employment benefits; and (5) sustain any recovery for mental anguish damages. The dealership further urges that the evidence conclusively establishes (1) that it exercised reasonable care to prevent or correct any harassing behavior and the employee unreasonably failed to avail herself of these procedures and (2) the after-acquired evidence defense to loss of future employment. Finally, the dealership contends the trial court erred in applying the Texas Labor Code damage cap per claim, rather than per complainant. The employee urges her own issues as a cross-appellant. First, she asserts that the trial court erred in granting JNOV on her defamation claims. She further argues that there is no evidence to support the findings on the dealership's counterclaims for theft or to support the award of attorney's fees to the dealership.

We conclude that legally sufficient evidence supports the jury's findings on the employee's sexual-harassment and retaliation claims, and that the evidence does not conclusively establish the dealership's affirmative defenses. However, we agree that the trial court erred in applying the Texas Labor Code damages cap. We further determine the employee's cross-issues lack merit. We modify the judgment

2

to reflect the appropriate damages in light of our resolution of the damages-cap issue, and we affirm the judgment as modified.

## I. BACKGROUND

Veronica Vinton-Duarte began working at River Oaks L-M. Inc. d/b/a West Point Lincoln Mercury (West Point) as the aftermarket sales manager in 2006.[1] Her immediate supervisor was the general sales manager, Bob Cesca, who reported to West Point's general manager, Chris Poulos. Vinton-Duarte was paid a base salary plus commission, and she relied largely on vehicle salespeople bringing customers to her for aftermarket accessory sales.

Several months after she started working at West Point, male co-workers began to subject her to sexual comments, including jokes about having sex with her that were told in front of other salespeople and suggestions that she dress more provocatively to increase sales. These comments and jokes became a common, almost daily, occurrence. Once, when she was kneeling to read a part number, new car salesperson Ryan O'Cain asked her to "take care of him" because she was "already down there." Salesperson Khalil Benazzouz joked about a dream he'd had involving Vinton-Duarte in front of her and other salespeople, in which he'd "done [Vinton-Duarte] all night long." He also told Vinton-Duarte he "was going to do [her] so hard he would get rid of all [her] frustration." Used car sales manager Dwight Jones also often made sexually inappropriate comments to Vinton-Duarte. When she told him she was "tired" of his comments, he responded that she didn't know how to take a compliment. Jones also regularly kissed her hand while breathing heavily on it, which made Vinton-Duarte "very uncomfortable."

---

[1] "Aftermarket" products include vehicle accessories that do not come with a new vehicle from the factory, but can be sold and added to the vehicle when it is purchased from the dealership.

Finance director Reggie McNair regularly propositioned Vinton-Duarte for dates and sex after she mentioned that her marriage had become "complaisant." He began asking her out and making comments, suggesting that they have "a relationship where there were no strings attached" and telling her none of his past girlfriends had "any complaints." Despite Vinton-Duarte's repeated refusals, McNair said he would continue to pursue her until he "closed her." McNair made harassing comments to Vinton-Duarte, including expressing his desire to "bury [his] face between her legs." McNair made comments and advances to her in front of other employees, including West Point managers. McNair also made comments and advances to other female employees at West Point, including two female salespersons. McNair did not stop his unwelcome comments, jokes, or solicitations; he often tried to give women at the workplace hugs and attempted to grab their buttocks. McNair frequently approached Vinton-Duarte in her office when she was alone to give her hugs. Vinton-Duarte stopped standing up when he was around in an effort to avoid his unwelcome hugs and touching. McNair asked her to hug him even when she was attempting to avoid him, and once McNair tried to physically pull her out of her chair so that he could hug her; accounting clerk Laura Garcia witnessed this interaction.

As the harassment of Vinton-Duarte transitioned from comments and jokes to physical touching, she began to try to deflect attention away from herself by changing her clothing, hair, and makeup. The harassment persisted, however. O'Cain grabbed Vinton-Duarte's buttocks as she walked by him in front of others; he even grabbed her buttocks in front of Cesca. Cesca apparently reprimanded O'Cain because the next day, O'Cain told her he had deliberately not brought some customers to her because she had gotten him into "trouble." When Vinton-Duarte complained to Cesca, Cesca told her to "just ignore it" and that O'Cain "would get

4

over it." Even Cesca sent Vinton-Duarte a sexually-themed video via company email.

Some combination of comments, solicitations, or unwanted touching was an almost daily occurrence for Vinton-Duarte from 2006 to 2009. Many of these incidents involved or occurred in front of West Point's managers, including the harassment by McNair and the touching by O'Cain that was seen by Cesca. Vinton-Duarte confided in office/accounting manager Lori Demaret many times over this time period. Demaret told her there was "different treatment between female employees and male employees." Demaret suggested that if Vinton-Duarte ever reported the harassment to the human resources department, Vinton-Duarte would need to be careful because Vinton-Duarte could lose her job; Demaret reminded Vinton-Duarte that the management of West Point was already aware of what was happening and chose to overlook it. According to Vinton-Duarte,

> So, many times when I went upstairs to talk to [Demaret], I would talk to her about different instances; but after talking to her and realizing that I could possibly lose my job over it, it made me second guess starting or initiating the process, or for me to be the one that brought it all to light because I couldn't afford to lose my job.

Vinton-Duarte was also concerned about reporting the harassment because Cesca hadn't taken it seriously.

The sexual harassment culminated in an incident that occurred in December of 2008. McNair came into Vinton-Duarte's office while she was sitting at her desk. He stood behind her and told her she didn't understand the "effect" she had on him and asked her to give him her hand. When she did, he rubbed her hand over his "aroused penis." She screamed and told him to get out of her office. Salesperson Ruben Mendoza heard Vinton-Duarte scream; Vinton-Duarte immediately told Mendoza what had happened. She also told Demaret about the

5

incident shortly after it occurred; Demaret acknowledged that Vinton-Duarte was very upset when she described the incident. Demaret "warned" Vinton-Duarte that "the attitude at West Point was that, if you were going to go to Human Resources and complain about anybody, you better – you might as well just pick up your box and pack your things, because that is ultimately what would happen."

Sometime in early June 2009, Demaret told Vinton-Duarte that she had recently attended a training session. Demaret told Vinton-Duarte that Vinton-Duarte needed to go to human resources or Demaret would "because it had gotten to a point where [Demaret] could lose her job if [Demaret] didn't report all the incidents that had been going on." Vinton-Duarte called human resources manager Renee Velasco to report the harassment shortly thereafter and set up a meeting to discuss the incidents.

After Vinton-Duarte's initial meeting with Velasco, Velasco summarized the meeting in a way that indicated that Vinton-Duarte did not want an investigation. Vinton-Duarte quickly corrected Velasco, telling her that she wanted an investigation "done right," as opposed to investigations in the past that hadn't been properly conducted and hadn't resulted in any changes. Velasco informed Vinton-Duarte that, as part of the investigation, she would have to tell the people she was investigating who had made the complaint. Vinton-Duarte was concerned because she knew she that would bring retaliation: "I knew that it would be a matter of time, that I would eventually lose my job; and I could not afford to lose my job."

More than a month after Vinton-Duarte met with Velasco, Velasco was still "working on a version of the complaint." Vinton-Duarte was "very concerned" about the time that had passed. Velasco completed the complaint and asked Vinton-Duarte to sign it; however, Vinton-Duarte had concerns about the complaint and emailed Velasco with them. Vinton-Duarte was "disappointed"

because she had met with Velasco on two occasions for more than an hour each time and gave Velasco as much information as she could, but much of this information was not included in the complaint Velasco drafted. Vinton-Duarte decided to write her own report.

On August 6, Vinton-Duarte met with Velasco and West Point legal representative Elza Bullock. On August 28, Bullock again met with Vinton-Duarte at West Point; he informed her that their investigation had "taken them into a different avenue," so they were investigating some other issues. He did not provide Vinton-Duarte with any specific information regarding what the other issues were. During the period between Vinton-Duarte's first meeting with Velasco and her August 28 meeting with Bullock, Vinton-Duarte sent several emails seeking an update on the status of the investigation; no one provided her with any updates. While the investigation was ongoing, the environment at West Point became very tense, and everyone was discussing the investigation. The salespeople had stopped bringing customers to Vinton-Duarte for aftermarket sales. Cesca stopped talking to Vinton-Duarte and told at least one other employee not to communicate with Vinton-Duarte. After Vinton-Duarte reported the harassment, "things just got worse really quickly." Nothing was being done and Vinton-Duarte explained that the stress became unbearable. Vinton-Duarte visited the doctor; he put her on some antidepressants to help alleviate some of the stress and pressure Vinton-Duarte was undergoing.

On August 31, Vinton-Duarte was called to the conference room at West Point. Chris Poulos, controller Linda Ellis, and Bullock were all there. They explained that she had been called up to answer some questions regarding a transaction. Vinton-Duarte was shown invoices from a transaction involving a toolbox, cargo carrier, and cargo bag that had occurred in March of 2009; Vinton-

Duarte explained she could not remember the details of this transaction. She was asked why she had coded the items on the invoices to the particular vehicles. Vinton-Duarte explained that she didn't know and that it had "obviously . . . been a mistake." Vinton-Duarte asked for more information, but was not permitted to see the transaction files. She was allowed to look through her own records in her office, but found no information on this transaction. Bullock told her she was being "released"; she was instructed to clean out her office, turn in her company vehicle, and leave the dealership.

During the following days, Vinton-Duarte received calls and messages from her former co-workers, who had been told she was terminated for theft. Mendoza specifically told her that West Point's management told him about the alleged theft and that West Point was going to press charges for theft against Vinton-Duarte. Vinton-Duarte was "devastated" that West Point was accusing her of theft; she felt it was a "slap in the face." Her employment termination created many problems in her life; she began having marital issues and the "stress was unbearable." She and her husband separated several times, although he stayed in the house with her. She and her husband discussed bankruptcy because there were bills they couldn't pay. Her electricity and water were turned off "a couple times," and it was hard to explain the financial difficulties to her children.

Vinton-Duarte was never contacted to further discuss or explain the matter; instead, she received her official termination letter on September 17, indicating she had been terminated for theft. West Point later "discovered" several other alleged thefts. First, West Point asserted that Vinton-Duarte stole four plasma televisions. Although West Point was invoiced for these TVs, on each invoice, Vinton-Duarte marked out "plasma TV" and wrote in "DVD player." The transaction files showed that each of the vehicles associated with these invoices had aftermarket DVD

players installed in them. Further, Vinton Duarte explained that the actual plasma TVs in question had been ordered for use as a sales promotion give-away. West Point's documents showed that the promotional TVs were delivered to West Point's parts department, and Cesca acknowledged that several TVs were given away as a sales promotion through the parts department. West Point also accused Vinton-Duarte of stealing upgraded wheels and tires in connection with a vehicle purchased by West Point accounting employee Laura Garcia's husband. Finally, West Point accused Vinton-Duarte of stealing a gaming system, but the dealership's documents showed that the system was installed in a customer's vehicle, and the customer paid West Point for the system. All of the theft allegations were brought to the attention of West Point's management by McNair after Vinton-Duarte lodged her sexual-harassment complaint; McNair apparently had never reported any prior allegations of theft to anyone at the dealership.

Vinton-Duarte filed suit against West Point for sexual harassment, retaliation, and defamation. West Point counterclaimed for theft, conversion, breach of fiduciary duty, and fraud based on the alleged thefts described above. After a five-day trial, the jury unanimously found in favor of Vinton-Duarte on her sexual-harassment and retaliation claims. The jury further found that West Point had defamed Vinton-Duarte. But the jury also found in West Point's favor on its counterclaims against Vinton-Duarte, awarding West Point damages only for theft of the toolbox, cargo carrier, cargo bag, and upgraded wheels and tires. The jury was dismissed without any stated objections to the verdict.

The trial court granted JNOV on Vinton-Duarte's defamation claim. The trial court otherwise entered judgment on the jury's verdict, awarding actual damages (plus pre-judgment interest) of $739,623.88, as found by the jury on Vinton-Duarte's sexual-harassment and retaliation claims, including offsets for the

statutory cap and the damages on West Point's counterclaims. The trial court also awarded Vinton-Duarte attorney's fees of $146,350.00, offset by the award of fees to West Point on its Texas Theft Liability Act counterclaim. This appeal timely followed.

## II. WEST POINT'S SUFFICIENCY ISSUES

Most of the parties' issues concern sufficiency of the evidence. Thus, we begin by setting forth the appropriate standard of review for these issues.

### A.     Standard of Review

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). When the appellant attacks the legal sufficiency of a finding on which it did not have the burden of proof, it must demonstrate that there is no evidence to support the finding. *Id.* at 810. When a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). We must first examine the record for evidence that supports the finding; if there is no evidence to support the finding, then we examine the entire record to determine if the contrary position is established as a matter of law. *See id.* We may sustain the issue only if the contrary position is conclusively established. *Id.*

We may not sustain a legal sufficiency, or "no evidence," point unless the record demonstrates that: (1) there is a complete absence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only

10

evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. The jury is the only judge of witness credibility and the weight to give to a witness's testimony. *See id.* at 819.

## B.    Retaliation Claim

In its first issue, West Point challenges the sufficiency of the evidence to support Vinton-Duarte's retaliation claim. Specifically, West Point asserts there is no evidence that "but for" the filing of her complaint, Vinton-Duarte would not have been discharged when she was. West Point further asserts that there was no evidence that the stated reason for her termination – theft of property – was false.

Vinton-Duarte brought her claim for retaliation under the Texas Commission on Human Rights Act (TCHRA). *See* Tex. Lab. Code Ann. § 21.055 (West, Westlaw through 2013 3d C. Sess.).[2] Here, in question number 5, the jury was charged as follows regarding Vinton-Duarte's retaliation claim:

> Did West Point discharge Veronica Vinton-Duarte because of Veronica Vinton-Duarte's making or filing of a complaint about sexual harassment by West Point?
>
> > Veronica Vinton-Duarte must establish that West Point's discharge of her from her employment, if any, would not have occurred when it did without her making or filing of a complaint about sexual harassment by West Point, if any.
> >
> > There may be more than one cause for an employment decision. Veronica Vinton-Duarte need not establish that her making or filing of a complaint about sexual harassment by West Point, if any, was the sole cause of her discharge from employment, if any.

---

[2] We may follow federal statutes and cases in applying the TCHRA. *See* Tex. Labor Code Ann. § 21.001; *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) (noting that, by enacting the TCHRA, the Texas Legislature "intended to correlate state law with federal law in employment discrimination cases").

11

Answer "Yes" or "No."

The jury answered in the affirmative. In question number 7, the jury was also asked, predicated on its answer to this question, "Did Veronica Vinton-Duarte engage in misconduct for which West Point would have legitimately discharged her solely on that basis?" The jury answered this question, "No."

At the charge conference, West Point did not object to the form of either of these questions. We thus measure the sufficiency of the evidence supporting the jury's answers to these questions using the charge given. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). As question numbers 5 and 7, excerpted above, correctly reflect, Vinton-Duarte was required to establish that West Point's discharge of Vinton-Duarte would not have occurred when it did without her making or filing of a sexual-harassment complaint, and Vinton-Duarte was not required to establish that her making or filing of a sexual-harassment complaint was the *sole* cause of West Point's discharge of Vinton-Duarte. *See Herbert v. City of Forest Hills*, 189 S.W.3d 369, 377 (Tex. App.—Fort Worth 2006, no pet.); *McMillon v. Tex. Dep't of Ins.*, 963 S.W.2d 935, 940 (Tex. App.—Austin 1998, no pet.).

Where, as here, there is no direct evidence of causation, circumstantial evidence and the reasonable inferences drawn from that evidence may provide affirmative support for a finding of a causal link. *La Tier v. Compaq Computer Corp.*, 123 S.W.3d 557, 562 (Tex. App.—San Antonio 2003, no pet.). Circumstantial evidence establishing the requisite causal link may include:

(1)    the employer's failure to follow its usual policy and procedures in carrying out the challenged employment actions;

(2)    discriminatory treatment in comparison to similarly situated employees;

(3)     knowledge of the discrimination charge or suit by those making the adverse employment decision;

(4)     evidence that the adverse employment decision was false; and

(5)     the temporal proximity between the employee's conduct and the adverse employment action.

*Adeshile v. Metro. Transit Auth. of Harris Cnty.*, No. 14-12-00980-CV, 2014 WL 3734140, at *4 (Tex. App.—Houston [14th Dist.] Jan. 16, 2014, pet. denied) (mem. op. on reh'g). We consider each of these factors in turn in weighing the sufficiency of the evidence to support the jury's retaliation findings.

The first two factors weigh in favor of the jury's finding. Although there is no evidence regarding West Point's "usual" policy and procedures for terminating an employee, the record reflects that at least two other male employees were not fired when theft allegations were lodged against them. First, Demaret testified that she investigated a parts department employee for several theft allegations. After she investigated an allegation that this employee had stolen a transmission, she concluded that he had done so. She also investigated an incident involving an irregularity with a wheel and tire and determined that the employee accused had stolen these items. Demaret brought this information to the attention of West Point's general manager Chris Poulos, but this employee was not fired.[3] Further, Cesca testified that a salesperson, perhaps O'Cain, had allowed a person to leave the dealership with upgraded wheels and tires for which the dealership had not been paid; Cesca believed that finance director McNair also may have been involved in this transaction. None of the employees involved were disciplined for

---

[3] Although Poulos testified that this employee had not committed these thefts, Demaret testified that he had; the jury is charged with credibility determinations and the weight to be given a witnesses' testimony. *See City of Keller*, 168 S.W.3d at 819. This parts department employee was later fired when West Point discovered money missing from a bank bag.

13

this incident. That these employees were not discharged after committing similar thefts to those Vinton-Duarte committed and that she was terminated after a single theft supports the jury's findings in response to questions 5 and 7. *See id.*; *cf. Tex. Div.-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 313 (Tex. 1994) (per curiam) ("*Uniform enforcement* of a reasonable absence-control provision, like the three-day rule in this case, does not constitute retaliatory discharge." (emphasis added)).

Next, there is ample evidence that those who made the decision to terminate Vinton-Duarte's employment were aware of her sexual-harassment allegations. In fact, there was testimony that the sexual-harassment investigation was an ongoing topic of conversation at the dealership. Poulos testified that when the theft allegations were brought to him, he took the issue to West Point's legal counsel Elza Bullock, who was charged with investigating Vinton-Duarte's sexual-harassment complaints. Vinton-Duarte testified that she had meetings with Bullock and communicated with him about her complaint. Poulos testified that Bullock was made aware that McNair, the employee against whom the most serious allegation of harassment had been lodged by Vinton-Duarte, had been the individual who brought the allegations of theft to Poulos's attention. At the meeting during which Vinton-Duarte was informed of the initial theft allegation and placed on leave, Bullock, controller Ellis,[4] and general manager Poulos were present. Thus, this evidence weighs in favor of the jury's findings on retaliation.

As noted above, the jury specifically found that Vinton-Duarte did not engage in misconduct that would have been the *sole* reason West Point legitimately discharged her. And to the extent that the jury's finding on theft, breach of fiduciary duty, fraud, or conversion conflict with the jury's findings on retaliation,

---

[4] Demaret testified that she informed Ellis about Vinton-Duarte's sexual harassment allegations against McNair. Further, Velasco's notes from her investigation indicate that she spoke with Ellis regarding Vinton-Duarte's sexual harassment allegations.

West Point has not preserved this issue for appellate review. *See* Tex. R. Civ. P. 295; *see also Lundy v. Masson*, 260 S.W.3d 482, 495 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) ("To preserve error, an objection to an incomplete or unresponsive verdict, *or conflicting jury findings*, must be made before the jury is discharged." (emphasis added)). Importantly, this is not a case in which the employee admitted to wrongdoing; instead, Vinton-Duarte explicitly denied engaging in theft and provided explanations for West Point's theft allegations against her. *Cf. Baker Hughes Oilfield Operations, Inc. v. Williams*, 360 S.W.3d 15, 24 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (op. on reh'g) (where employee admitted to violating company policy, there was no reasonable factual basis for jury to have found company's stated reason for termination pretextual). Moreover, as noted above, there is evidence that other employees who had been accused of engaging in similar misconduct (stealing items) from West Point were not terminated. Based on this evidence, the jury reasonably could have believed that West Point's stated reason for Vinton-Duarte's termination was not the *sole* reason for her discharge and that she would not have been fired when she was without having made or filed the complaint about sexual harassment. *See McMillon*, 963 S.W.2d at 940.

Finally, Vinton-Duarte reported the sexual harassment on June 4, 2009; her "official complaint" was provided to Velasco around July 14. She was notified on August 31 that West Point was suspending her employment and was formally notified that she had been terminated on September 17. Thus, there is a gap of slightly over three months from her initial report of sexual harassment to her official termination; in other words, there is a sufficiently close temporal proximity between Vinton-Duarte's making or filing the complaint about sexual harassment and West Point's discharge of Vinton-Duarte from her employment. *Cf. Evans v.*

*City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (noting that time lapse of up to four months was sufficient to satisfy retaliatory causal connection for summary judgment purposes). This evidence militates soundly in favor of the jury's finding that West Point retaliated against Vinton-Duarte.

In sum, we conclude that more than a scintilla of evidence supports the jury's finding of retaliation, as well as its finding that Vinton-Duarte did not engage in other misconduct for which West Point would have legitimately discharged her solely on that basis. Accordingly, we conclude that legally sufficient evidence supports the jury's findings on retaliation, and we overrule West Point's first issue.

## C.    Failure to Take Prompt, Remedial Action

As part of the jury's finding of sexual harassment in response to question number 1, the jury determined that West Point knew or should have known of the harassment and failed to take prompt, remedial action to eliminate the harassment. In its second issue, West Point contends the evidence is legally insufficient to support these two findings.

Prompt, remedial action is that which is reasonably calculated to end the harassment. *See Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 615 (5th Cir. 1999). "What constitutes prompt remedial action is a fact-specific inquiry and not every response by an employer will be sufficient to absolve the employer of liability." *Williams-Boldware v. Denton Cnty., Tex.*, 741 F.3d 635, 640 (5th Cir. 2014) (citation and internal quotation marks omitted), cert. denied 135 S. Ct. 106 (2014). If the employee establishes that the employer's response was not reasonably calculated to end the harassment, the employer may be liable despite having taken remedial steps. *Id.*

Here, there is evidence from which the jury could have determined that, once West Point was made aware of the harassment, it failed to take prompt, remedial measures to eliminate the harassment. Vinton-Duarte first reported the harassment to West Point in early June 2009. West Point did not begin investigating her complaint—other than speaking with Vinton-Duarte—until August 6, after Vinton-Duarte emailed Velasco to find out what had been done about her complaint and informed Velasco that the touching and comments had continued since Vinton-Duarte made her complaint. *Cf. McMillon*, 963 S.W.2d at 939 ("When McMillon complained of her co-worker's unwanted sexual comments and conduct, the Department quickly investigated the allegations. The Department put the co-worker on administrative leave while the investigation was pending."). Further, Vinton-Duarte repeatedly brought the amount of time it was taking to complete the investigation to the attention of West Point.[5] Despite these numerous communications, Vinton-Duarte was never given any information concerning the

---

[5] On August 6, 2009, Vinton-Duarte emailed Velasco to ask for an update on the investigation and a date by which she could expect resolution of her complaint. In this email, she stated, "I have tried to keep you as well informed as possible[] regarding the on-going issues here *which are still occurring on a regular basis. Nothing has changed.*" (emphasis added). Then, on August 18, Vinton-Duarte emailed Bullock and Velasco to inquire into the status or outcome of the investigation. In this email, Vinton-Duarte stated that she met with Bullock on August 6 and was informed it would "be a few days" before she could expect a resolution. Vinton-Duarte explained that since the interviews had been conducted at West Point, "tension among the employees . . . has been at an all time high" and that, despite any instructions, the investigation "has been a constant topic of conversation." Vinton-Duarte followed up with another email to Bullock and Velasco on August 25, noting that "the working environment ha[d] deteriorated immensely" and she had "become labeled as an employee to avoid at all cost." She further stated that the time it was taking to complete the investigation, coupled with the lack of confidentiality, provided "a clear and perfect example" of "why the females [who] have all had issues in the past[] are in fear of coming forth." She stated that she brought the complaint to the attention of the human resources department nearly three months previously and she had been forced to continue to work "under these conditions" since then. Once again, she asked for any information regarding the investigation. Finally, on August 28, she emailed Bullock and Velasco again expressing her concerns and seeking communications regarding the investigation.

investigation, except to be told that her name, as the complainant, would have to be revealed to those against whom she had made allegations.

Moreover, the record reflects that West Point conducted harassment training on October 21-22, 2009, over a month after Vinton-Duarte had been terminated and four months after she reported the harassment. And the only formal remedial action was taken on November 20, 2009, when the dealership placed letters of warning in the personnel files of two employees against whom Vinton-Duarte had made allegations.[6] Further, it is undisputed that no final report was ever prepared concerning Vinton-Duarte's sexual-harassment allegations, despite West Point's stated policy that the "EEO officer shall . . . issue fact findings and recommendations as with any other [discrimination] complaint."

Finally, Vinton-Duarte testified that she suffered retaliatory treatment after filing her complaint: she testified that she was asked if she had "told on" anyone at the dealership; she stated the sales people stopped bringing customers to the aftermarket department; and she explained that Cesca stopped communicating with her and that he told sales manager Gary LaCroix not to talk to her either. She complained to West Point that the environment had become tense and that the investigation was "a constant topic of conversation." *Cf. Wal-Mart Stores, Inc. v. Davis*, 979 S.W.2d 30, 39 (Tex. App.—Austin 1998, pet. denied) (explaining that similar retaliatory conduct "send[s] a message that there are negative consequences of complaining, thereby defeating the goal of creating effective grievance

---

[6] Notably, the "warning" placed in McNair's file indicates that West Point was "unable to determine if [he] made any sexually oriented comments to Ms. Duarte or subjected her to any unwelcome touching," despite testimony not only from Vinton-Duarte about the specific incident in which he placed her hand on his penis, but also testimony from those who spoke with Vinton-Duarte immediately after the incident occurred and noted that she was upset and distressed when describing the incident. Additionally, another female employee reported that she had issues with McNair touching her. O'Cain also had a letter placed in his personnel file because he acknowledged that he had touched Vinton-Duarte inappropriately.

mechanisms"). And, importantly, the jury's finding of retaliation against Vinton-Duarte undermines West Point's claim that it attempted to prevent future harassment. *See Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 525 (5th Cir. 2001).

Based on this evidence, the jury reasonably could have determined that West Point knew or should have known of the harassment and that it failed to take prompt, remedial action to eliminate the harassment.[7] Thus, legally sufficient

---

[7] West Point's actions are in stark contrast with the employer's actions in a case in which the Austin Court of Appeals upheld a jury finding that an employer took prompt, remedial measures. *See McMillon*, 963 S.W.2d at 940. In *McMillon*, the Department of Insurance put the alleged harasser on administrative leave while it investigated the complaint. *Id.* at 937, 940 After concluding that sexual harassment occurred, the Department placed the offender on a ninety-day probationary period, reduced his pay by $5,000 a year, transferred him to a non-managerial position in another division, required him to attend sexual harassment awareness training, and required him to review the agency's policies regarding sexual harassment. *Id.* The sexual harassment complained of in *McMillon* did not involve any allegations of inappropriate touching. *See id.*

Here, even though much of what Vinton-Duarte reported was corroborated by other witnesses during the investigation of her complaint, West Point chose to believe those accused of harassment and disbelieve those who reported inappropriate behavior. For example, Velasco's interview notes indicate that LaCroix admitted to touching Vinton-Duarte's breast and calling himself the "Breast Doctor." O'Cain stated that LaCroix made comments to another female employee about being willing to pay for a "boob job." O'Cain further told Velasco that he had seen salesperson Benazzouz "grab" Vinton-Duarte, that certain events "have gone over the line," and that he had touched Vinton-Duarte on the "high buttocks area" on a few occasions. Cesca acknowledged that he had seen inappropriate behavior, including a Mardi Gras beads incident involving LaCroix, in which LaCroix suggested that female employees show him their breasts in return for Mardi Gras beads. Salesperson Perry Hicks reported that he had seen inappropriate conduct; he had seen O'Cain touch Vinton-Duarte's "rear," and she told O'Cain to stop. Salesperson Mendoza explained that he was aware of improper conduct; he'd seen people grab Vinton-Duarte's "butt." He also reported that Vinton-Duarte told him about the incident with McNair immediately after it occurred and that another female employee had also complained about McNair. Mendoza suggested that McNair, Benazzouz, and used car sales manager Jones would need "a lot of training" to address their behavior. Garcia reported to Velasco that she heard Benazzouz and McNair make sexually explicit remarks to Vinton-Duarte and that Vinton-Duarte told her about the incident with McNair; she stated that Vinton-Duarte was upset when she told her about the McNair incident. Demaret reported that she had been exposed to unwelcome touching by McNair and that her interview with Velasco could be a "career ending conversation." Demaret suggested that McNair should be fired for his conduct. Yet despite this

19

evidence supports the challenged jury findings regarding sexual harassment, and we overrule West Point's second issue.

## D. *Faragher/Ellerth* **Affirmative Defense**

West Point argues in issue three that it "conclusively established" its *Faragher/Ellerth* defense,[8] despite the jury's unanimous finding to the contrary. In response to jury question number 2, the jury found that a preponderance of the trial evidence did not show that West Point exercised reasonable care to prevent and correct promptly any harassment based on sex and that Vinton-Duarte unreasonably failed to take advantage of any preventative or corrective opportunities by her employer or to avoid harm otherwise. The first element of this defense can be satisfied by showing that the employer had a policy against sexual harassment in place, and it enforced the policy. *See Casiano v. AT&T Corp.*, 213 F.3d 278, 286 (5th Cir. 2000); *Bartkowiak v. Quantum Chem. Corp.*, 35 S.W.3d 103, 111 (Tex. App.—Amarillo 2000, no pet.).

The second prong of the defense recognizes an employee's corresponding duty to avoid or mitigate harm. *Faragher v. City of Boca Raton*, 524 U.S. 775, 805–06 (1998). "An employer may, for example, have provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment . . . . If the plaintiff unreasonably failed to avail herself of the employer's preventative or remedial apparatus, she should not recover damages that could have been avoided had she done so." *Id.* at 806–07. If the employee unreasonably fails to promptly

---

corroboration of Vinton-Duarte's allegations, as noted above, the only actions West Point took were to (1) terminate Vinton-Duarte's employment for theft; (2) conduct company-wide sexual harassment training several months after Vinton-Duarte's complaint was filed; and (3) place letters in the personnel files of McNair and O'Cain.

[8] *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764–65 (1998).

report the offensive conduct, the second prong of the affirmative defense is satisfied. *Casiano*, 213 F.3d at 287; *Bartkowiak*, 35 S.W.3d at 111. Here, as discussed above in response to West Point's second issue, we already have determined that West Point did not take prompt, remedial action to eliminate the sexual harassment. Moreover, although Vinton-Duarte did not report the sexual harassment as required by company policy, we conclude that more than a scintilla of evidence supports the jury's implied finding that the evidence did not show Vinton-Duarte *unreasonably* failed to take advantage of any preventive or corrective opportunities by her employer or to avoid harm otherwise for the following reasons.

In addition to West Point's failure to take prompt, remedial measures discussed above, there is evidence from which the jury could have inferred that many of the employees interviewed by Velasco were unfamiliar with the company's sexual-harassment policy; in particular, Vinton-Duarte's supervisor Cesca acknowledged that he failed to follow the policy himself. Further, Vinton-Duarte stated she had witnessed other "situations" that had not been resolved at the dealership; she noted in an email to Velasco that she did not want her complaint "handled in the same manner as the ones in the past because (1) it hasn't resolved these types of issues and (2) when just those people involved in the complaint are singled out and talked to then it becomes evident as to who made those complaints against them." She also stated she had "seen in the past when this had happened and how people retaliated against those individuals." Even Velasco admitted that her failure to file a written report detailing the investigation was a violation of company policy. Thus, the jury reasonably could have inferred that West Point's policy was not a "proven, effective mechanism for reporting and resolving complaints of sexual harassment." *See Faragher*, 524 U.S. at 806–07.

21

Additionally, there is more than a scintilla of evidence that West Point's management knew about and even participated in the harassment.[9] As discussed in more detail above, Vinton-Duarte made complaints about finance director McNair. Indeed, the single most serious allegation she lodged was against McNair. Further, Vinton-Duarte testified that, early on during her employment at the dealership, her own manager, Cesca, saw O'Cain grab her inappropriately. Cesca failed to address this situation appropriately; when Vinton-Duarte notified Cesca that O'Cain refused to bring customers to her because Cesca had reprimanded him, Cesca told her to "just ignore him" and he would "get over it." Vinton Duarte testified that she had informed Cesca about the harassment before this incident occurred, and he told her "he was going to handle the situation." But nothing changed; according to Vinton-Duarte, she continued to be subjected to the sexually harassing comments almost daily. The inappropriate comments were made in front of salespeople and sales managers; everyone just "laughed it off." Even Cesca sent her an email with sexual material in it.

When Vinton-Duarte talked to Demaret about the ongoing harassment, Demaret advised her that if she reported the harassment to human resources, the "[s]hit would hit the fan." Demaret suggested that Vinton-Duarte consider that "the managers were aware of it; and they overlooked it; and that [Vinton-Duarte] needed to consider, possibly eventually losing [her] job."[10] Vinton-Duarte testified that general manager Poulos "was aware of the situation and he just turned the other way."

---

[9] Although much of the evidence concerning management's knowledge of the harassment came from Vinton-Duarte, the jury was free to credit her testimony and disbelieve the testimony from other witnesses to the contrary. *See City of Keller*, 168 S.W.3d at 819.

[10] Much of what Vinton-Duarte claimed Demaret said was confirmed by Velasco's interview notes. However, Demaret could not recall having made those statements during her interview.

22

In sum, from this evidence, the jury reasonably could have concluded that Vinton-Duarte did not act unreasonably in failing to complain promptly about the sexual harassment. *Cf. Mota*, 261 F.3d at 525–26 (concluding that employee did not act unreasonably by delaying reporting of sexual harassment for "eight or nine months" because of threats of retaliation and possible belief that resort to administrative process was ineffectual). A jury thus could have determined that West Point failed to meet its burden of proof in establishing this affirmative defense. Accordingly, we conclude that legally sufficient evidence supports the jury's negative answer in response to question 2, and we overrule West Point's third issue.

## E.    Vinton-Duarte's Attorney's Fees

### 1.    *Sufficiency of the Evidence*

In issue five, West Point contends the evidence is legally insufficient to support the trial court's award of attorney's fees to Vinton-Duarte under section 21.259(a) of the Texas Labor Code.[11] *See* Tex. Lab Code Ann. § 21.259(a) (West, Westlaw through 2013 C. Sess.). Texas courts have used the lodestar method in awarding attorney's fees under this statute. *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012). The starting point for determining a lodestar fee award is the number of hours "reasonably expended on the litigation." *Id.* at 762–63 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The party applying for the award bears the burden of proof. *See Hensley*, 461 U.S. at 437. The proof should include the basic facts underlying the lodestar, which are: (1) the nature of the work, (2) who performed the services and their rate, (3) approximately when the services were performed, and (4) the number of hours worked. *El Apple I*, 370

---

[11] The trial court determined the amount of attorney's fees to be awarded to Vinton-Duarte under this statute.

S.W.3d at 763. Although contemporaneous evidence may not exist regarding fees, attorneys may reconstruct their work to provide the trial court with sufficient information to allow it to perform a meaningful review of the fee application. *Long v. Griffin*, 442 S.W.3d 253, 255–56 (Tex. 2014).

Here, Vinton-Duarte's counsel provided an affidavit in support of Vinton-Duarte's claim for attorney's fees, which amounted to a total of $176,350. In this affidavit, Vinton-Duarte's counsel, Matthew Pearson, stated that actual time records had not been kept, but he conducted a "forensic review" of the firm's files, including "a review of the pleadings, written discovery, deposition transcripts, and motions and responses of the parties." Thus, it appears that Vinton-Duarte's counsel properly reconstructed his firm's work. *See id.* In his affidavit, Pearson opined that the reasonable hourly rate for his time is $300 and the reasonable hourly rate for the time of the paralegal who assisted him in the case was $100. Pearson expressly described the qualifications of his legal assistant, that she performed substantive legal work under his direction and supervision, and the nature of the legal work she performed. *See El Apple I*, 370 S.W.3d at 763 (noting that paralegal fees have been denied absent such proof). Further, Pearson attached to this affidavit an "attorney and paralegal time tracking chart." On this chart, Pearson split his time and that of the paralegal who worked on the case into the following categories: EEOC; Interrogatories; Requests for Production; Document Review; Requests for Disclosures; Pleadings; Motions; Depositions; and Pre-trial, Trial, and Entry of Judgment. Under most of these categories, there is a fairly specific description of items, with a breakdown of the attorney and paralegal time spent on each item. Dates are also provided for most of the items.

From Pearson's affidavit and the attached chart, the trial court could adequately review: (1) the nature of the work, (2) who performed the services and

their rates; (3) approximately when the services were performed; and (4) the number of hours worked. *See id.* Thus, this case is distinguishable from *El Apple I*, where the attorneys only provided the total number of hours worked and their hourly rates. *See id.* ("In this case, neither attorney indicated how the 890 hours they spent in the aggregate were devoted to any particular task or category of tasks. Neither attorney presented time records or other documentary evidence. Nor did they testify based on their recollection of such records.").

Finally, Pearson noted in his affidavit that the reasonableness of the fees "is further established by [West Point]'s expert . . . who testified that his firm's fee was substantially larger for significantly less work. He testified that his firm's fee for handling [West Point]'s counterclaims was $235,000.00 in attorney time and $34,000.00 in paralegal time from late 2010 to January 2013."

Based on this evidence, we conclude that the there is sufficient evidence from which the trial court could meaningfully review the fee request and that legally sufficient evidence supports the trial court's award of attorney's fees to Vinton-Duarte. *See id.* at 764. We thus overrule this portion of West Point's fifth issue.

## 2. *Segregation of Attorney's Fees*

Texas law does not permit recovery of attorney's fees unless authorized by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006). Attorney's fees are not recoverable on Vinton-Duarte's defamation claim or in defense of the numerous tort counterclaims asserted by West Point, unless "discrete legal services advance both a recoverable and unrecoverable claim." *Arlington Home Inc. v. Peak Envtl. Consultants, Inc.*, 361 S.W.3d 773, 784 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (citation and quotation omitted).

25

On appeal, West Point specifically complains of the failure to segregate attorney's fees for Vinton-Duarte's defamation claims, asserting that these claims were "wholly unrelated to the sexual harassment or retaliation claims" and were "in no way determinative of the sexual harassment or retaliation causes of action." But in his affidavit, Pearson explained that the theft allegations were the basis of West Point's affirmative defense to Vinton-Duarte's retaliation claim and "were therefore inextricably intertwined with [Vinton-Duarte's] affirmative claims." In turn, Pearson opined that the "same theft allegations raised in [West Point]'s affirmative defense are the basis of [Vinton-Duarte]'s defamation claims" and he had to "perform the same legal work to prove the retaliation claims as the defamation claims." He testified that he segregated all but the "nominal" amount of time he spent researching portions of the jury charge for defamation and that amount of time was not reflected in his affidavit and attached chart of fees. Though in part of his affidavit, Pearson uses the "inextricably intertwined" approach that the Supreme Court of Texas has abrogated, Pearson went further to state that the same legal work was necessary to prove the retaliation claims, for which attorney's fees are recoverable, and to prove the defamation claims, for which attorney's fees are not recoverable. *See Tony Gullo Motors*, 212 S.W.3d at 313–14 (stating that "[i]ntertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated"). We conclude that Vinton-Duarte sufficiently established that discrete legal services advancing both recoverable and unrecoverable claims were provided, and she sufficiently segregated any fees that were not recoverable. *See Arlington Home, Inc.*, 361 S.W.3d at 784; *see also Sentinel Integrity Solutions, Inc. v. Mistras Group, Inc.*, 414 S.W.3d 911, 929–30 (Tex. App.—Houston [1st Dist.] 2013, pet denied) (upholding award of attorney's fees in part because attorney's testimony was some evidence that numerous,

26

discrete legal services either related directly to the claim for which fees were permitted or "were intertwined with that claim").

In short, legally sufficient evidence supports the award of attorney's fees to Vinton-Duarte, and she sufficiently segregated her fees. We thus overrule West Point's fifth issue in its entirety.

## F.    Lost Earnings/Employment Benefits After September 2010

In its sixth issue, West Point challenges the legal sufficiency of the evidence to support the jury's finding that $164,000 would fairly and reasonably compensate Vinton-Duarte for recovery of lost earnings/employment benefits that in reasonable probability will be sustained in the future. West Point asserts that Vinton-Duarte cannot claim future lost income that she could or should have earned from other jobs after her termination from West Point. West Point cites evidence that Vinton-Duarte accepted a position in September 2010 at one automobile dealership, resigned that position to accept another position, and was terminated from the second position as well as a third position. West Point contends there was "no evidence that anyone other than [Vinton-]Duarte caused or contributed in any way to her loss of employment" at various dealerships at which she had been employed after September 2010.

But Vinton-Duarte's expert, Keith Fairchild, testified that he calculated her lost future income and benefits by taking into account amounts she actually earned as well as "reasonably anticipated future wages." Thus, the damages numbers for present value of future lost earnings and employment benefits presented to the jury through his testimony took into account Vinton-Duarte's reasonably likely future income. And West Point has not challenged Fairchild's opinions, which supported an award of future lost earnings and employment benefits of up to about $416,000. The evidence of Vinton-Duarte's employment history after West Point discharged

27

her does not conclusively prove that Vinton-Duarte suffered no damages for lost earnings/employment benefits in the future or vitiate the proof of these damages offered by Vinton-Duarte. And, as noted above, the jury awarded Vinton-Duarte only $164,000, considerably less than the amount supported by the evidence.[12]

Under these circumstances, we conclude that legally sufficient evidence supports the jury's finding as to future lost earnings and employment benefits. We therefore overrule West Point's sixth issue.

## G. After-Acquired Evidence Defense

In its seventh issue, West Point asserts that the evidence conclusively established the after-acquired evidence defense to loss of future benefits. "If an employer establishes that the employee's misconduct was so severe that the employee would have been discharged solely on that basis, after-acquired evidence of the employee's misconduct bars reinstatement and recovery of actual damages for the period after the employer discovered the grounds for termination." *Trico Techs. Corp. v. Montiel*, 949 S.W.2d 308, 312 (Tex. 1997). Under this doctrine, the employee may only recover back pay from the date of the unlawful discharge to the date of the discovery of the employee's misconduct. *Id.*

Here, however, as discussed above, we have determined that sufficient evidence supports the jury's finding that Vinton-Duarte did not commit misconduct that would have been the sole legitimate reason for her discharge. *See id.* (misconduct must be so severe that employee would have been "discharged

---

[12] To the extent that West Point's complaint encompasses any failure by Vinton-Duarte to mitigate lost future earnings, such a claim is a defensive issue on which West Point bore the burden of proof, and West Point has not shown that it conclusively proved this defense. *See Tex. Animal Health Comm'n v. Garza*, 27 S.W.3d 54, 62 (Tex. App.—San Antonio 2000, pet. denied).

28

solely on that basis"). This finding vitiates West Point's after-acquired evidence defense. Accordingly, we overrule West Point's seventh issue.

## H.    Mental Anguish Damages

In issue eight, West Point asserts that the evidence is legally insufficient to support any recovery of mental anguish damages, and West Point challenges the jury's finding of mental anguish damages as to both the sexual-harassment claim and the retaliation claim. West Point briefs an argument challenging the legal sufficiency of the evidence of mental anguish damages, urging that Vinton-Duarte's testimony is no evidence of mental anguish under *Parkway Co. v. Woodruff*, 901 S.W.2d 434 (Tex. 1995). But the jury never made any finding as to "mental anguish" damages, and the trial court did not award such damages. Instead, the jury found amounts of damages as to the following elements: "Compensatory damages in the past, which include emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other noneconomic losses." Although mental anguish is a component of this damage element, four other types of damages are also included.

At the charge conference, West Point did not object to the form of this damage element or the legal sufficiency of the evidence to support its submission, nor did West Point request that any part of this damage element be submitted separately.[13] To challenge the legal sufficiency of these jury findings, West Point must show that the evidence is legally insufficient to support the entire amount of the damage award based on all of the component elements. *See Thomas v. Oldham*, 895 S.W.2d 352, 359–60 (Tex. 1995); *Barnhart v. Morales*, No. 14-12-00167-CV,

_____

[13] West Point did not preserve error in the trial court as to any *Casteel* complaint, and on appeal, West Point does not seek a new trial based on any such complaint. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 387–89 (Tex. 2000).

—S.W.3d—, 2015 WL 1020869, at *10 (Tex. App.—Houston [14th Dist.] Mar. 5, 2015, no pet. h.). Even under a liberal construction of West Point's brief, West Point has not challenged the entire damages award; thus we must reject its evidentiary challenge to this single element of a multi-element damage award. *See Thomas*, 895 S.W.2d at at 360; *Barnhart*, 2015 WL 1020869, at *10; *Mariner Health Care of Nashville, Inc. v. Robins*, 321 S.W.3d 193, 211 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citing *Brookshire Bros., Inc. v. Lewis*, 997 S.W.2d 908, 922 (Tex. App.—Beaumont 1999, pet. denied) ("[T]o successfully challenge a multi-element damage award on appeal, an appellant must address all of the elements and show the evidence is insufficient to support the entire damage award.")).

Our sister court here in Houston has reached the same conclusion when confronted with a sufficiency challenge to mental anguish damages in a discrimination and retaliation suit. *See A & L Ind. Servs., Inc. v. Oatis*, No. 01-11-00471-CV, 2013 WL 5970933, at *9 (Tex. App.—Houston [1st Dist.] Nov. 7, 2013, no pet.) (mem. op.). In that case, the First Court of Appeals was confronted with a factual sufficiency challenge to mental anguish damages and the exact same jury question as we have here:

> Here, the jury was asked, with respect to each plaintiff, "What sum of money, if any, if paid now in cash . . . would be a fair and reasonable compensation" for "compensatory damages in the past, which include emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other noneconomic losses?" A & L made no objection. . . .
>
> A & L argues only that the compensatory damages award is unsupported because there is factually insufficient evidence to support an award of mental anguish damages. A & L does not challenge the sufficiency of the evidence with respect to the other elements submitted in the same question: "emotional pain and suffering, inconvenience, loss of enjoyment of life, or other noneconomic loss."

30

> Accordingly, we hold that A & L has waived appellate review of its sufficiency challenge to compensatory damages.

*Id.* (citations omitted); *see also Tex. Youth Comm'n v. Koustoubardis*, 378 S.W.3d 497, 501–02 (Tex. App.—Dallas 2012, no pet.) (overruling sufficiency challenge to identical jury question because the appellant failed to challenge "whether the evidence of emotional pain and suffering, inconvenience, loss of enjoyment of life, or other noneconomic loss was sufficient to support the award").[14]

Accordingly, we overrule West Point's eighth issue.

### III. TCHRA DAMAGES CAP

In West Point's fourth issue, it asserts that the trial court erred in applying the statutory damages cap on a "per claim" rather than a "per claimant" basis and that the trial court also erred in determining the amount of the cap applicable in this case. Under the TCHRA, a court may award compensatory damages, capped on a sliding scale commensurate with the size of the employer, on a finding that an

---

[14] "When damages issues are submitted in broad-form, it is difficult, if not impossible, to determine the amount that the jury awarded for each element of damages. As a result, to challenge a multi-element damage award on appeal successfully, a party must address all of the elements of damages and show that the evidence is insufficient to support the entire damage award." *City of Houston v. Levingston*, 221 S.W.3d 204, 230 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *G.T. Mgmt., Inc. v. Gonzalez*, 106 S.W.3d 880, 885 (Tex. App.—Dallas 2003, no pet.); *Norfolk S. Ry. Co. v. Bailey*, 92 S.W.3d 577, 583–84 (Tex. App.—Austin 2002, no pet.)).

The policy underlying this rule is fully applicable here inasmuch as the record reflects that Vinton-Duarte testified that after she filed the sexual harassment complaint, salespeople stopped bringing customers to her, some of the other West Point employees stopped socializing with her, and she was questioned by co-workers about her involvement with the sexual harassment investigation. Further, she testified that, after she was discharged from West Point, her electricity and water were cut off when she couldn't pay the bills, she almost lost her home, and it was difficult to explain to her children why she and her husband were having these financial problems. The jury was free to consider this as evidence of the "inconvenience" suffered by Vinton-Duarte in making its compensatory damages award. Thus, there is more than a scintilla of evidence to support a finding of damage as to at least one other, unchallenged element of the jury's damages award.

31

employer engaged in unlawful intentional employment practices. *See* Tex. Labor Code Ann. § 21.2585 (West, Westlaw through 2013 3d C. Sess.).

The statutory cap found in section 21.2585 is an affirmative defense that must be pleaded and proved. *See O'Dell v. Wright*, 320 S.W.3d 505, 515–16 (Tex. App.—Fort Worth 2010, pet. denied); *Shorline, Inc. v. Hisel*, 115 S.W.3d 21, 25 (Tex. App.—Corpus Christi 2003, pet. denied). West Point pled the statutory damages cap. We thus consider the component parts of West Point's issue in turn: (1) whether the statutory cap applies to each complainant or to each claim; and (2) whether West Point established it was entitled to the $100,000 cap applicable to employers with fewer than 201 employees. *See* Tex. Labor Code Ann. § 21.2585(d)(2).

### 1. *Per claim vs. per claimant*

As to the first sub-issue, West Point urges that the trial court misapplied the damages cap *in toto* by applying it per claim, rather than applying it to the sum of compensatory damages awarded to Vinton-Duarte as a single complainant. We agree; the plain language of the statute reflects that the compensatory damages awarded under this provision apply to *each complainant* rather than to each claim. *See id.* § 21.2585(d) ("The sum of the amount of compensatory damages awarded under this section . . . may not exceed, for *each complainant* . . . ." (emphasis added)). In turn, "complainant" is defined as "an individual who brings an action or proceeding" under Chapter 21 of the Texas Labor Code. *See id.* § 21.002(4) (West, Westlaw through 3d C. Sess.). Thus, the statutory language indicates that the cap applies to each complainant, rather than to each claim. This conclusion is bolstered by the application of the similarly-worded damages cap in Title VII actions. *See* 42 U.S.C. § 1981a(b)(3) ("The sum of the amount of compensatory damages awarded under this section . . . shall not exceed, *for each complaining*

*party . . . .*" (emphasis added)); *see, e.g.*, *Black v. Pan Am. Lab., L.L.C.*, 646 F.3d 254, 263–64 (5th Cir. 2011) (agreeing with several other federal courts and holding that "the plain language of § 1981a(b)'s cap applies to each party in an action"). Having determined that the cap applies to the entire compensatory damages awarded on Vinton-Duarte's TCHRA claims, the question remains what particular cap applies in this case.

## 2. *Applicable Damages Cap*

West Point claims that, because it had fewer than 201 employees when Vinton-Duarte made her complaint, the damages cap applicable in this case is $100,000. *See* Tex. Labor Code Ann. §21.2585(d)(2) (damages cap is "$100,000 in the case of a respondent that has more than 100 and fewer than 201 employees"). As noted above, it was West Point's burden to establish its entitlement to this cap. West Point did not seek a finding on this issue. Rule 279 provides that any issues excluded from the charge that are "not conclusively established under the evidence and no element of which is submitted or requested are waived." *See* Tex. R. Civ. P. 279. If a claim is established as a matter of law, however, no question must be submitted to the jury for consideration. *Brown v. Bank of Galveston*, 963 S.W.2d 511, 515 (Tex. 1998); *see also City of Keller*, 168 S.W.3d at 814–15 ("Jurors are not free to reach a verdict contrary to [the] evidence; indeed uncontroverted issues need not be submitted to a jury at all."). Thus, we must examine the record to determine whether West Point conclusively established it had fewer than 201 employees at the time Vinton-Duarte filed her sexual-harassment complaint.

The only evidence on this issue was the testimony of human resources manager Velasco, who testified that West Point had "approximately 200 employees" in 2009. Testimony that there were approximately 200 employees at West Point does not establish conclusively that there were "fewer than 201

33

employees"; use of the word "approximately" means that there could be somewhat more or somewhat fewer than 200 employees at West Point. Additionally, there was testimony that Velasco, Ellis, and Terri Henderson worked for both West Point and its sister dealership, but were working at the other location. We conclude that the trial evidence did not conclusively establish that West Point had fewer than 201 employees, and the trial court did not err in applying the $200,000 damages cap. Accordingly, Vinton-Duarte's total compensatory damages award for her TCHRA claims should have been $564,000: retaliation front and back pay of $364,000, which is not subject to the damages cap, and sexual-harassment/retaliation compensatory damages of $200,000, pursuant to the appropriate damages cap. *See* Tex. Labor Code Ann. § 21.2585(d)(3).

We sustain in part West Point's fourth issue. We modify the trial court's judgment to reflect the appropriate damages award.[15]

## IV. VINTON-DUARTE'S CROSS-ISSUES

Vinton-Duarte brings three issues in her cross-appeal. In her first issue, she asserts that the trial court erred in granting JNOV on her defamation claims. In her second and third issues, she asserts that the there is no evidence to support (a) the jury's findings on West Point's counterclaims for theft and (b) the award of attorney's fees under the Theft Liability Act. We address each of these issues in turn.

---

[15] Under our rules of appellate procedure, we may modify the trial court's judgment and affirm as modified. *See* Tex. R. App. P. 43.2, 43.3; *see also Garza v. Cantu*, 431 S.W.3d 96, 108–09 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (op. on reh'g) (remanding although appellant requested rendition).

## A.    JNOV on Vinton-Duarte's Defamation Claims

We review a trial court's ruling on a motion for JNOV under a legal-sufficiency standard. *See City of Keller*, 168 S.W.3d at 823 ("[T]he test for legal sufficiency should be the same for summary judgment, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review."); *see also Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 626 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). This standard of review is set forth above in section II.A.

The jury unanimously found that West Point published the following statements about Vinton-Duarte:

- That Veronica Vinton-Duarte was accused of stealing from West Point.
- That Veronica Vinton-Duarte was accused of theft from West Point.
- That West Point would press charges for theft against Veronica Vinton-Duarte.

The jury further found that these statements were defamatory, which the charge properly defined as statements "an ordinary person would interpret . . . in a way that tends: 1) to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury; or 2) to impeach the person's honesty, integrity, virtue, or reputation." *See, e.g., Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 727 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (similarly defining defamatory statements), *abrogated on other ground by In re Lipsky*, —S.W.3d—, No. 13-0928, 2015 WL 1870073 (Tex. 2015). The jury found both that these statements were false *and* not substantially true when they

35

were made.[16] The jury was instructed in both questions that a statement is not substantially true if, in the mind of the average person, the gist of the statement "is no more damaging to the person affected by it than a literally true statement would have been."

In West Point's motion for JNOV and on appeal, it points out that a defendant may defeat a claim for defamation by proving that an alleged defamatory statement is true. We agree: "Truth is a complete defense to defamation." *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). The truth of the first two of these statements is undisputed and proven as a matter of law in the record evidence. Vinton-Duarte was accused of stealing or theft from West Point. Indeed, Vinton-Duarte acknowledged as much in her testimony, and the letter of termination from West Point specifically states that her employment was being terminated "for engaging in theft from the company." Thus, the trial court did not err in granting JNOV on the jury's findings to these two statements.[17] Further, in the mind of the average person, the "gist" of the third statement—that "West Point would press charges for theft" against Vinton-Duarte—is no more damaging to Vinton-Duarte than the literally true statement that she was accused of theft. Thus, we conclude that the trial court did not err in

---

[16] Here, the trial court asked one jury question in which Vinton-Duarte had the burden of proving the statements were false (Question 12) and another question in which West Point had the burden of proving the statements were "substantially true" (Question 13). In suits brought by private individuals, truth is an affirmative defense to slander. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). We need not address whether the form or the submission of either question was correct because (a) neither party objected to the form or the submission of either question, and (b) we may affirm the trial court's JNOV if the evidence proved as a matter of law that the statement is either true or substantially true. *See Osterberg*, 12 S.W.3d at 55.

[17] At the charge conference, Vinton-Duarte did not object to the form of the defamation questions. Thus, we measure the sufficiency of the evidence by the charge as given. *See Osterberg*, 12 S.W.3d at 55; *Yeng v. Zou*, 407 S.W. 3d 485, 489–90 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

36

granting JNOV on the jury's findings as to this statement because the evidence proved as a matter of law that this statement was substantially true, thus barring recovery for defamation. *See KTRK Television v. Felder*, 950 S.W.2d 100, 107 (Tex. App.—Houston [14th Dist.] 1997, no writ.).

For the foregoing reasons, we overrule Vinton-Duarte's first cross-issue.

## B. Sufficiency of the Evidence to Support West Point's Counterclaims

In Vinton-Duarte's second and third cross-issues she challenges the sufficiency of the evidence to support the jury's findings on West Point's counterclaims[18] and the award of attorney's fees under the Texas Theft Liability Act to West Point. These issues are subject to the sufficiency standard of review set forth above in section II.A.

### 1. Legal sufficiency of evidence of counterclaims

The jury found that Vinton-Duarte committed theft, conversion, breach of fiduciary duty, and fraud. Because the jury was asked a single damages question

---

[18] Vinton-Duarte states this issue in her brief as follows: "The findings on West Point's counterclaims for theft are all against the great weight and preponderance of the evidence." Thus, she presents this issue as a challenge to the factual sufficiency of the evidence. *See, e.g.*, *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam). Raising a factual sufficiency issue in a motion for new trial is a prerequisite for appellate review. *See* Tex. R. Civ. P. 324(b)(2), (3); *Daniels v. Empty Eye, Inc.*, 368 S.W.3d 743, 749 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). Vinton-Duarte did not file a motion for new trial; thus we do not address the factual sufficiency of the evidence to support West Point's theft counterclaims. But in her argument supporting this issue, Vinton-Duarte repeatedly suggests there is "no evidence" or "less than a scintilla of evidence" to support the jury's findings, as well as requesting that we reverse and render a take-nothing judgment on these counterclaims. Thus, her arguments in support of this issue are in the nature of a challenge to the legal sufficiency of the evidence, for which no motion for new trial was required. Instead, a legal sufficiency challenge to a jury's finding may be preserved for appeal in one of the following five ways: (1) a motion for a directed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the issue to the jury; (4) a motion to disregard the jury's answer to a vital fact or issue; or (5) a motion for new trial. *Daniels*, 368 S.W.3d at 748–49. Our review of the record indicates that Vinton-Duarte filed a motion for JNOV on this issue; thus we address this issue as a legal sufficiency challenge only.

related to all four of these findings, to sustain the trial court's judgment awarding damages on West Point's counterclaims, there need only be legally sufficient evidence to support the liability finding as to one of West Point's counterclaims and as to the damages findings. Based upon the jury's damages findings, it appears that the jury believed that Vinton-Duarte engaged in misconduct in relation to four items: a toolbox, a cargo carrier, a cargo bag, and a set of wheels and tires.[19] After examining the record, we determine that legally sufficient evidence supports the jury's finding that Vinton-Duarte engaged in conversion.

The jury was asked the following question regarding conversion:[20]

---

[19] For these findings, the jury was asked the following damages question and provided the underlined answers:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate West Point for its damages, if any, proximately caused by such conduct by Veronica Vinton-Duarte?
>
> > Consider the following elements of damages, if any, and none other. Do not increase or reduce the amount in this answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.
>
> Answer in dollars and cents for damages, if any, for each of the following:
>
> a. Theft of a toolbox, cargo carrier, and cargo bag.
>
>  Answer: $ 936.00
>
> b. Theft of four (4) plasma flat screen televisions.
>
>  Answer: $ 0
>
> c. Theft of wheels and tires.
>
>  Answer: $ 1750.00
>
> d. Theft of gaming system.
>
>  Answer: $ 0

[20] As with most of the other jury questions discussed *supra*, there was no objection to this question. Thus, we measure the sufficiency of the evidence by the charge given. *Osterberg*, 12 S.W.3d at 55; *Yeng*, 407 S.W.3d at 489–90.

Do you find that Veronica Vinton-Duarte converted the personal property of West Point?

> A party converted the personal property of another if the party exercised dominion over the personal property of another without consent of the owner and to the exclusion of the owner's right of possession and use. Wrongful intent is not required.

Answer "Yes" or "No."

The jury answered this question "yes."

First, concerning the toolbox, cargo carrier, and cargo bag, Vinton-Duarte claimed that these charges were simply an oversight and that the vehicles identified on the invoice were sold with other aftermarket items that cost the same amount. She acknowledged that she sent her father to pick up the actual items reflected on the invoice, however. Additionally, these items were purchased from a particular vendor, Master Hitch. The owner of Master Hitch testified at trial. According to his testimony, Vinton-Duarte's father picked up the items and signed the invoice in his presence. Master Hitch's owner saw the toolbox being installed on Vinton-Duarte's father's truck. He also identified the tool box pictured on her father's truck as the "exact one" sold to West Point that he saw installed on the truck. Although the Master Hitch owner did not track the vehicle identification number (VIN) for the toolbox, he explained that the vehicle "wasn't from the dealership. It was Mr. Vinton's truck." Finally, there was evidence that Vinton-Duarte authorized payment of the Master Hitch invoice and that she provided the VINs for charging each of the items; the invoice indicates that these items were charged to vehicles with which they would not be compatible. From this evidence, the jury reasonably could have inferred that Vinton-Duarte exercised dominion over the toolbox, cargo carrier, and cargo bag of West Point to the exclusion of West Point's right of possession and use of these items—i.e., that Vinton-Duarte

converted these items. We also conclude that the evidence is legally sufficient to support the jury's damage finding regarding the theft of these items.

Turning to the wheels and tires, it is undisputed that Jose Ortega, the husband of West Point employee Garcia, had these items installed at American Wheel & Tire (AW&T) on the vehicle he purchased from West Point. West Point's paperwork associated with the sale of Ortega's vehicle indicated that West Point did not owe him any aftermarket items. Although Ortega originally paid for the wheels and tires, the charge to his credit card was later reversed because West Point paid AW&T for these accessories. The manager of AW&T testified at trial. He explained that he was instructed by Vinton-Duarte to bill West Point for the wheels and tires installed on Ortega's vehicle: "I was told by Ms. Duarte to send her the invoice, that West Point would be paying for the wheels and tires for Mr. Ortega. . . . And that we were to credit his credit card back." AW&T's manager also testified that the wheels and tires for which he invoiced West Point would not fit on a Grand Marquis, which was the vehicle stock number listed on the AW&T invoice that Vinton-Duarte authorized to be paid. This evidence supports the jury's finding that Vinton-Duarte committed conversion as to this transaction. We also conclude the evidence is legally sufficient to support the jury's damage finding regarding the theft of the wheels and tires.

In short, there is more than a scintilla of evidence to support the jury's finding that Vinton-Duarte committed theft of these specific items from West Point and the damage findings regarding them. We therefore overrule Vinton-Duarte's second cross-appellate issue.

2.    *Theft Liability Act Attorney's Fees*

Duarte next contends that West Point failed to present more than a scintilla of evidence to support the jury's award of $30,000 in attorney's fees. West Point

sought recovery of the fees under the Texas Theft Liability Act (TTLA). *See* Tex. Civ. Prac. & Rem. Code Ann. § 134.005(b) (West, Westlaw through 2013 3d C. Sess.) ("Each person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees."). An award of attorney's fees under the TTLA is mandatory. *See id.*; *Arrow Marble, LLC v. Est. of Killion*, 441 S.W.3d 702, 705 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

> When an award of attorney's fees to a prevailing party is mandated by statute, the factfinder can decide to award zero attorney's fees only if the evidence (1) failed to prove (a) that the attorney's services were provided or (b) the value of the services provided; or (2) affirmatively showed that (a) no attorney's services were needed or (b) that any services provided were of no value. . . . If there is any evidence in support of the award of fees, the factfinder does not have discretion to award no fees.

*Arrow Marble*, 441 S.W.3d at 708–09.

Vinton-Duarte first asserts that, because there is no evidence of theft, there is no evidence to support the jury's findings under the TTLA. But, as discussed above, we have concluded that legally sufficient evidence supports the jury's findings on West Point's counterclaims. Thus, this portion of her argument is unavailing.

Vinton-Duarte further urges that West Point's proof of the reasonableness and necessity of its fees wholly failed to meet the requirements of *El Apple I. See* 370 S.W.3d at 760–63. *El Apple I* established the methods by which a party may prove up its fees using the lodestar method. *See id.* But West Point did not present attorney's fees under the lodestar method,[21] and our research has not revealed any

---

[21] *See United Nat'l Ins. Co. v. AMJ Invs., LLC*, 447 S.W.3d 1, 15–16 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (explaining that even if lodestar method is not applicable to a particular case, if a party chooses that method to establish its attorney's fees, legally sufficient evidence must support award under standards of *El Apple*).

TTLA cases in which this method has been used. *But see Sw. Grain Co. v. Pilgrim's Pride S.A. de C.V.*, No. 13-07-00557-CV, 2010 WL 2638483, at \*8–9 (Tex. App.—San Antonio June 28, 2010, pet. denied) (mem. op.) (analyzing sufficiency of the evidence in a TTLA case using the *Arthur Andersen* factors). Thus, we conclude that *EI Apple* is not instructive to our analysis of the legal sufficiency of the evidence. *Cf. Concert Health Plan, Inc. v. Houston Nw. Partners, Ltd.*, No. 14-12-00457-CV, 2013 WL 2382960, at \*9 n.17 (Tex. App.— Houston [14th Dist.] May 30, 2013, no pet.) (mem. op.) (noting that, in a breach-of-contract case, the lodestar method of calculating attorney's fees is not applicable).

Here, the jury was instructed to consider the following non-exclusive factors in determining a reasonable fee for the necessary services of West Point's attorney:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly;

(2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

These factors track those described in *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (quoting Tex. Disciplinary R. Prof.

Conduct 1.04, reprinted in Tex. Gov't Code, tit. 2, subtit. G. app.). Vinton-Duarte does not appear to have challenged the sufficiency of the evidence to support the jury's finding based on these factors, but for the sake of completeness, we address this issue.

Frederick T. Johnson, one of West Point's attorneys, testified as to the reasonableness and necessity of West Point's attorney's fees on its TTLA claims. First, we note that West Point failed to timely disclose its attorney's fees invoices, and Johnson was limited, without objection, to testifying regarding the non-invoiced fees incurred during trial only. Johnson went through several of the factors identified above, testifying as follows regarding factors (1), (4), (6), and (7):

- [T]he Texas Theft Liability Act is not a statute that is – frequently invoked. It's a relatively new statute. But when you have a case that involves an allegation of theft, it necessarily involves, you know, trying to overcome people who are trying to hide what they are doing. . . . But what's unique about a theft case or a – dishonesty case that is different than a personal injury case or a breach of contract case or the like is that you have to overcome – you frequently have people trying to cover up their conduct, people trying to make something look like what it's not. And we have to overcome that using something less than perfect information. And so it makes it complex.

- [T]he amount involved is not astronomical, but it's an important amount. And it's important because, one, it's money that's owed to West Point; and, two, it is – it is a matter that is of grave concern to a company who [sic] has an employee theft issue. . . . The other thing is that, in attempting to prove the theft, it is – that is essentially wound up, balled up with the claim of sexual harassment and specifically the claim of retaliation because if the theft allegation is proved, the retaliation claim tends to be disproved.

- Mr. Bullock [West Point's counsel] go back about eight or nine years – with my work from my law firm. He and I have worked

43

on a number of cases together, not a ton of cases, but they have been important cases. And he and I have a good working relationship. And one of the things that – is important for me as a lawyer is to make sure that the client is – is satisfied with the representation. . . . [F]rom my experience as a lawyer, a small percentage of your clients provide a large percentage of your work. And good work begets good work. If you do a good job for that small percentage of clients, they will continue to bring you work.

- Mr. Bullock came to me. He knew that my hourly rate was – at the time that he hired me was $425 an hour. He knew that I had younger associates like Mr. Stafford available at rates – I think Mr. Stafford's rate was $165 an hour when . . . Mr. Bullock hired us. But Mr. Bullock looks at the experience of the lawyer, not necessarily the – the hourly rate, in determining who he wants because he decides, is this an important case.

Johnson also testified regarding his background and experience; he stated that he is familiar with reasonable rates charged for commercial litigation in Harris County based on his background and experience, as well as his knowledge of what other firms charge. Johnson opined that a reasonable and necessary fee for the trial time spent on West Point's TTLA counterclaims, after segregating out any non-recoverable fees, was $46,000.

Johnson's testimony covered most of the *Arthur Andersen* factors identified above. And "'evidence of each of the *[Arthur] Andersen* factors is not required to support an award of attorney's fees.'" *Vela v. Vela*, No. 14-12-00822-CV, 2013 WL 6700270, at *8 (Tex. App.—Houston [14th Dist.] Sept. 24, 2013, no pet.) (mem. op. on reh'g) (quoting *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 706 (Tex. App.—Dallas 2008, no pet.) (citation omitted)). Further, the jury awarded less than the amount to which Johnson testified: As noted above, Johnson opined that a reasonable and necessary fee was $46,000, yet the jury awarded only $30,000.

After evaluating Johnson's testimony, we conclude that legally sufficient evidence supports the jury's award of attorney's fees to West Point under the TTLA. Accordingly, we overrule Vinton-Duarte's third and final cross-issue.

## V. CONCLUSION

We have sustained in part West Point's issue concerning the statutory damages cap. Our resolution of this issue requires recalculation of Vinton-Duarte's damages.[22] We thus reform the judgment as follows:

> The amount awarded to Vinton-Duarte against West Point is reduced from $739,623.88 to $625,197.87. Vinton-Duarte is awarded actual damages from West Point in the amount of $625,197.87. This amount consists of $560,814.00 of compensatory damages as awarded by the jury on the sexual harassment and retaliation claims, and prejudgment interest of $64,383.87 calculated from August 30, 2010 until November 24, 2013. The compensatory damages reflect a reduction of $3,186.00, the amount awarded to West Point by the jury on its counterclaims and a reduction of $125,000.00 due to the statutory damages cap provided by the Texas Labor Code.

---

[22] This figure was computed as follows:

A. TCHRA Claims Not Subject to Damage Cap

| | | |
|---|---|---|
| a. | Retaliation – Front Pay | $164,000.00* |
| b. | Retaliation – Back Pay | $200,000.00 |
| | *Subtotal* | *$364,000.00* |

B. TCHRA Claims Subject to Damage Cap:

| | | |
|---|---|---|
| a. | Sexual Harassment – Compensatory Damages | $100,000.00 |
| b. | Retaliation – Compensatory Damages | $225,000.00 |
| c. | Application of Damage Cap | -125,000.00 |
| | *Subtotal* | *$200,000.00* |

| | |
|---|---|
| C. Offset for West Point's Counterclaims | *-3,186.00* |
| D. Applicable Pre-judgment Interest at 5% | *$ 64,383.87* |
| TOTAL DAMAGES | $625,197.87 |

(*No pre-judgment interest calculated on this amount.)

45

We do not reform the trial court's award of attorney's fees. Having overruled the rest of the parties' issues, we affirm the judgment as so modified.


/s/　　　　　Sharon McCally
　　　　　　Justice


Panel consists of Chief Justice Frost and Justices Boyce and McCally.