

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00248-CV

_____

GRANBURY SNF LLC D/B/A GRANBURY REHAB & NURSING,
ADVANCED HCS LLC D/B/A ADVANCED HEALTHCARE SOLUTIONS,
AND GRANBURY REHAB & NURSING GS LLC, Appellants

V.

NATALIE JACKSON, Appellee

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. C2021152

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

Following a jury trial on Appellee Natalie Jackson's unlawful retaliation claim against Appellants Granbury SNF LLC d/b/a Granbury Rehab & Nursing, Advanced HCS LLC d/b/a Advanced Healthcare Solutions, and Granbury Rehab & Nursing GS LLC, the jury ruled in Jackson's favor, awarding her certain compensatory damages in the past and future and certain exemplary damages against each of Appellants. On appeal, Appellants raise six issues challenging whether (1) there is legally sufficient evidence that Granbury GS suspended or terminated Jackson, (2) there is legally sufficient evidence to support the jury's finding of mental anguish damages in the past, (3) there is legally sufficient evidence to support the jury's finding of mental anguish damages in the future, (4) there is clear and convincing evidence of reprehensible conduct by Appellants warranting exemplary damages, (5) the trial court erred by awarding exemplary damages against each of Appellants, and (6) there is legally sufficient evidence to support the trial court's award of contingent appellate attorney's fees.

We will hold that Appellants have failed to preserve most of these issues. Specifically, they have failed to preserve their first through third issues, their fourth issue as to the exemplary damages awarded against Granbury SNF and Advanced HCS, and their fifth issue. We will thus overrule those issues because they are not preserved. We will address Appellants' fourth issue as to the exemplary damages

2

awarded against Granbury GS and Appellants' sixth issue, and we will overrule those issues on the merits. Accordingly, we will affirm the trial court's judgment.

## II. BACKGROUND

### A. Jackson's Employment at Granbury Villa and Appellants' Association with Granbury Villa

In 2020, Jackson was employed as a social worker at Granbury Villa, a skilled nursing and rehabilitation center. Granbury GS was listed as Jackson's employer on her W-2. Advanced HCS oversaw the operation of Granbury Villa, and it employed Sherri Mecaskey as its regional director of operations. Granbury SNF employed a facility administrator to work at Granbury Villa, Kevin Willmeth, who also served as the facility's abuse coordinator. Jackson reported to Willmeth, and Willmeth reported to Mecaskey.[1]

### B. Jackson's Report of and Investigation of Abuse at Granbury Villa

On the weekend of December 19–20, 2020, two certified nursing assistants from a different facility filled in to work at Granbury Villa (the Visiting CNAs). On December 22, the daughter of one of the residents reported to Jackson that the Visiting CNAs had been "rough" with her mother. That same day, Jackson reported those concerns to the facility's director of nursing, Karen Morton, an employee of

---

[1]Jackson testified that Willmeth was her "direct supervisor."

Advanced HCS.[2] Due to those concerns, Jackson was tasked with interviewing other residents regarding potential abuse.

During her interviews—which occurred on December 22–23—eight residents reported either being mistreated by the Visiting CNAs or seeing the Visiting CNAs mistreat another resident. The allegations included the Visiting CNAs making fun of a resident's penis; being "very rough" with a resident; bruising a resident's arm after grabbing it to change the resident; refusing to change a resident after the resident requested to be changed; screaming and yelling at a resident; being "very rough" with and "hurting" a resident who had recently had back surgery; refusing to help change a resident who had wet clothes; and bruising a resident's hand while putting her to bed. Jackson turned in her written abuse report to Morton on December 24. According to Jackson, none of the residents who had reported the abuse had any history of making false reports.

## C. The Re-Interviewing of the Complaining Residents and Jackson's Remark to Morton Regarding Another CNA

Following Jackson's interviews, Willmeth and Mecaskey re-interviewed the complaining residents. Based on those subsequent interviews, Willmeth and Mecaskey believed that there were inconsistencies in what they had been told by the residents and what was reported by Jackson. Willmeth and Mecaskey also thought

---

[2]Jackson testified that Morton acted as the facility's abuse coordinator when Willmeth was gone. Willmeth was on vacation on December 22, although he returned to the facility that day after Mecaskey notified him of the allegations.

4

that Jackson had been biased in interviewing the residents, as Jackson had allegedly asked the residents, "[W]hat did the two black girls do to you?"[3]  As explained by Mecaskey, Jackson "was putting words in people's mouth[s]" and "became overzealous basically in the investigation."

Willmeth and Mecaskey were also concerned about a statement Jackson made to Morton on December 28 after a new CNA began working at the facility. According to Morton, Jackson approached her about the new CNA and said, "They can't even get here on time.  What are you doing bringing more in so they can abuse our residents all night long like the other ones?"  Morton viewed Jackson's comment as "highly offensive and unacceptable on many levels," and she reported the comment to Mecaskey.

**D.**     **The Written Disciplinary Memorandums Pertaining to Jackson, the December 29 Meeting to Discuss the Memorandums, Jackson's December 29 Suspension, and Jackson's December 30 Termination**

Jackson was written-up by Mecaskey for her conduct during her interviews of the residents.   To that end, Mecaskey filled out an "Associate Disciplinary Memorandum,"[4] in which she stated, "Description of violation:   Performance Deficiencies that Jeopardize the operation of the community:  During an investigation tactics taken to obtain statements from residents and family members was conducted

---

[3]The Visiting CNAs were both African American.

[4]The memorandum was signed on December 29, 2020.

5

in a bias format which impeded the investigation."[5] Jackson was asked to sign the disciplinary memorandum, and when she signed it, she left the following hand-written comment,

> Certainly would not want to jeopardize the operation of the community and it[']s disturbing to see that[']s how my actions are being viewed. I did not have any tactics during the investigation other than to follow protocol [and] the abuse questionnaire I was given. Absolutely no bias stance or opinion and I am sincerely taken [a]back by what has been said [and] written. I had no agenda or motives during my part . . . . This is a sad day in my career [and] I'm making this statement, "I am sad for what is stated in this document [and] what has been presented to me. It is not a reflection of my character or work ethic.["]

Jackson was also written-up by Mecaskey for her December 28 statement to Morton regarding the new CNA. To that end, Mecaskey filled out another "Associate Disciplinary Memorandum,"[6] in which she stated, "Description of violation: Professionalism; During a conversation with [Morton] on 12/28/20 Natalie Jackson made the comment[,] 'They can't even get here on time. What are you doing bringing more in so they can abuse our residents all night long like the other ones?'" Once again, Jackson was asked to sign the disciplinary memorandum, and she left the following hand-written comment when she signed it,

> I did not say "they can[']t even get here on time." I did however say "hopefully they will not be leaving bruises like the last CNAs[.]" I[']m ashamed and embarrassed, I knew it was wrong when I said it. It was an

---

[5]We have not corrected this memorandum for any spelling, capitalization, or grammar mistakes.

[6]Like the other disciplinary memorandum, this one was signed on December 29, 2020.

ignorant comment [and] complet[ly] irresponsible [and] unprofessional. Again, I knew when it came out it was wrong. It was not at all a reflection of how I view . . . management, specifically [Morton]. I know her best interest is protecting the residents. This statement was wrong. I am embarrassed [and] genuinely sorrowful. No excuses. It was wrong.

On December 29, Jackson met with Mecaskey, Willmeth, and Morton to go over the disciplinary memorandums. According to Jackson, Mecaskey asked her at the meeting if she would "like another chance" to conduct the interviews of the residents. Jackson declined, responding, "I don't know why I would do that. . . . I'm completely lost with what's going on here. . . . What is documented . . . is what your residents in this building said. I documented it and I did my job and I have told the truth."

At the December 29 meeting, Jackson's employment was suspended by Mecaskey pending investigation.[7] Both Mecaskey and Willmeth signed the document that stated that Jackson was being suspended. On December 30, Jackson's employment was terminated by Willmeth. Both Willmeth and Morton signed the document that stated that Jackson's employment was being terminated. That document gave the following explanation for Jackson's termination:

As a leader with Granbury Villa, you are ex[p]ected to be an example by upholding the company's mission and standard and by following company guidelines and policies and procedures.

---

[7]Morton testified that Jackson was suspended approximately two hours before the State came to the facility to investigate a different set of allegations pertaining to abuse at the facility. Morton acknowledged that the State would typically want to talk with the facility's social worker—Jackson—during such an investigation.

7

On 12-28-2020[,] Natalie Jackson made unprofessional [and] inappropriate comments to a leadership team member in regards to another team member coming to work from a sister facility to assist with direct patient care.

## E. Procedural History

Jackson later filed suit against Appellants, bringing a claim of unlawful retaliation for reporting abuse. *See* Tex. Health & Safety Code Ann. § 260A.014. Following a jury trial, the jury found that all three of Appellants had retaliated against Jackson. The jury further found that Jackson should be awarded $400,000 for her compensatory damages in the past and $100,000 for her compensatory damages in the future. It also found by clear and convincing evidence that the harm caused to Jackson resulted from Appellants' malice or gross negligence. The jury found that $5,000,000 in exemplary damages should be assessed against Advanced HCS, $2,000,000 in exemplary damages should be assessed against Granbury SNF, and $1,000,000 in exemplary damages should be assessed against Granbury GS.

The trial court later signed a final judgment awarding Jackson, in accordance with the jury's findings, $400,000 in compensatory damages for noneconomic losses in the past and $100,000 in compensatory damages for noneconomic losses in the future. After applying damages caps, the trial court's final judgment reduced the award of exemplary damages to $500,000 against each of the three Appellants (for a total of $1,500,000 in exemplary damages). *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b)(1)(B).

8

The trial court later conducted a bench trial on the issue of conditional appellate attorney's fees. Following that bench trial, the trial court awarded conditional appellate attorney's fees to Jackson. Those conditional appellate attorney's fees included an award of $215,000 for representation for an appeal in the court of appeals, $65,000 for representation at the petition for review stage in the Texas Supreme Court, $75,000 for representation at the merits briefing stage in the Texas Supreme Court, and $45,000 for representation through oral argument and the completion of post-oral-argument proceedings in the Texas Supreme Court.

Appellants later filed a motion to modify the final judgment, which the trial court denied. This appeal followed.

## III. DISCUSSION

### A. Appellants' Unpreserved Complaints

We begin our analysis by addressing Appellants' failure to preserve many of their complaints.

#### 1. Appellants' First Issue

In their first issue, Appellants argue that the trial court erred by entering a judgment against Granbury GS because there is legally insufficient evidence that Granbury GS suspended or terminated Jackson. Jackson contends that Appellants have failed to preserve this issue. We agree.

Following a jury trial, a legal-sufficiency challenge may be preserved in the trial court in one of the following ways: (1) a motion for instructed verdict, (2) a motion

9

for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or (5) a motion for new trial. *In re D.T.*, 625 S.W.3d 62, 75 n.8 (Tex. 2021); *Jimison v. MAEDC-Hulen Bend Senior Cmty., L.P.*, No. 02-23-00206-CV, 2024 WL 3282544, at *8 (Tex. App.—Fort Worth July 3, 2024, no pet.) (mem. op.).

Here, Appellants did not file a motion for instructed verdict, a motion for judgment notwithstanding the verdict, a motion to disregard the jury's answer to a vital fact issue, or a motion for new trial. While Appellants did make certain objections to the jury charge, none of those objections concerned the issue of whether Granbury GS had suspended or terminated Jackson. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997) (holding that the complaint on appeal must be the same as that presented in the trial court); *Catalanotto v. Meador Oldsmobile LLC*, No. 02-10-00044-CV, 2011 WL 754413, at *8 (Tex. App.—Fort Worth Mar. 3, 2011, no pet.) (mem. op.) (holding that appellant's objection made at trial to one part of a jury question did not preserve his complaint made on appeal to another part of the jury question). Because Appellants did not raise this issue in the trial court, they have failed to preserve it. *See Jimison*, 2024 WL 3282544, at *8 (holding that appellant failed to preserve her legal-sufficiency complaint when she did not file a motion for instructed verdict, did not file a motion for judgment notwithstanding the verdict, did not object to the submission of the issue to the jury, did not file a motion to disregard the jury's answer, and did not file a motion for new trial); *Perez v. Williams*, No. 02-21-

00395-CV, 2022 WL 17351581, at *5 (Tex. App.—Fort Worth Dec. 1, 2022, no pet.) (mem. op.) (similar).

In their reply brief, Appellants argue that they have preserved this issue, pointing to their motion to modify the final judgment. In that motion, Appellants complained about the exemplary damages awarded against Granbury GS. Appellants argued that there was no evidence to support that award, and they asked the trial court to modify the final judgment to remove the exemplary damages awarded against Granbury GS. While in one sentence of the motion Appellants stated that "there was no evidence to support an award of any damages—much less exemplary damages— against Granbury GS," Appellants did not ask the trial court to modify the final judgment to remove *all* damages against Granbury GS. Rather, the only relief requested by Appellants in their motion to modify the final judgment was for the trial court to modify the final judgment by removing the exemplary damages awarded against Granbury GS. The complaint raised in that motion—attacking the exemplary damages awarded against Granbury GS—does not match the complaint raised in Appellants' first issue—whether there is legally insufficient evidence that Granbury GS suspended or terminated Jackson. Thus, Appellants have not preserved this issue. *See Banda*, 955 S.W.2d at 272; *Catalanotto*, 2011 WL 754413, at *8.

We overrule Appellants' first issue.

11

## 2. Appellants' Second and Third Issues

In their second and third issues, Appellants argue that there is legally insufficient evidence to support the jury's findings of mental anguish damages in the past and in the future.[8]  Jackson contends that Appellants have failed to preserve these issues.  We agree.

When damages issues are submitted in broad form (as they were here), it is difficult, if not impossible, to determine the amount that the jury awarded for each element of damages.  *River Oaks L-M. Inc. v. Vinton-Duarte*, 469 S.W.3d 213, 237 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Tex. Youth Comm'n v. Koustoubardis*, 378 S.W.3d 497, 501 (Tex. App.—Dallas 2012, no pet.).  Accordingly, to successfully challenge a multi-element damage award on appeal, a party must address all elements of damages and show that the evidence is insufficient to support the entire damage award.  *River Oaks L-M. Inc.*, 469 S.W.3d at 237; *Koustoubardis*, 378 S.W.3d at 501.  Failure to do so results in a waiver of the sufficiency challenge.  *Koustoubardis*, 378 S.W.3d at 501; *Norfolk S. Ry. Co. v. Bailey*, 92 S.W.3d 577, 584 (Tex. App.—Austin 2002, no pet.).

Here, the jury was asked a broad-form question regarding the amount of Jackson's damages stemming from Appellants' unlawful retaliation against her.  The jury was told that Jackson's compensatory damages in the past and future included

[8]Appellants' second issue concerns the jury's finding of mental anguish damages in the past, while Appellants' third issue concerns the jury's finding of mental anguish damages in the future.  We will discuss these issues together.

12

"injury to name or reputation, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other noneconomic losses." Appellants did not object to the broad-form submission of that damages question, and they do not challenge on appeal any other element included in the broad-form damages question other than Jackson's mental anguish damages.[9]

Thus, Appellants have failed to preserve their challenges to the sufficiency of the evidence to support the jury's findings of mental anguish damages in the past and in the future. *See Thomas v. Oldham*, 895 S.W.2d 352, 359–60 (Tex. 1995) (overruling appellant's no-evidence challenge to certain elements of damages award when appellant did not object to the broad-form submission of the damages question or challenge the legal sufficiency of all elements included in the damages award); *OakBend Med. Ctr. v. Simons*, No. 01-19-00044-CV, 2021 WL 3919218, at *13 (Tex. App.—Houston [1st Dist.] Sept. 2, 2021, no pet.) (mem. op.) ("Because OakBend did not challenge the multi-element damage award on all elements of compensatory

---

[9]In a footnote in their reply brief, Appellants state, "To the extent Jackson contends that the jury's award included damages to name and reputation, the evidence is also legally insufficient." A party may not raise a new issue in a reply brief. *Holdridge v. Wallace Ryne, O.D., P.C.*, No. 02-23-00420-CV, 2024 WL 3455838, at *7 n.16 (Tex. App.—Fort Worth July 18, 2024, no pet.) (mem. op.); *Arreola v. Union Pac. R.R.*, 657 S.W.3d 789, 818 (Tex. App.—El Paso 2022, no pet.). Accordingly, we need not consider Appellants' argument regarding the sufficiency of the evidence to support any damages to Jackson's name and reputation. *See Jimison*, 2024 WL 3282544, at *7 n.10 (refusing to consider argument raised for the first time in appellant's reply brief); *Anderson v. Innovative Insulation, Inc.*, No. 02-21-00183-CV, 2021 WL 5742082, at *7 n.12 (Tex. App.—Fort Worth Dec. 2, 2021, no pet.) (mem. op.) (same).

damages, it waived appellate review of its sufficiency challenge."); *Koustoubardis*, 378 S.W.3d at 501 (holding that appellant failed to preserve its complaint regarding the sufficiency of the evidence to support the award of mental anguish damages when it did not object to the broad-form submission of the damages question and did not challenge the sufficiency of the evidence to support other damages elements included in the broad-form damages question); *Simmons v. Bisland*, No. 03-08-00141-CV, 2009 WL 961522, at *8 (Tex. App.—Austin Apr. 9, 2009, pet. denied) (mem. op.) ("Simmons and Lindig argue on appeal that there is no evidence to support an award for mental anguish, but [they] did not object to the inclusion of this element of damages in the broad-form question before it was read to the jury and therefore waived any legal sufficiency challenge regarding mental anguish.").

We overrule Appellants' second and third issues.[10]

---

[10]In their reply brief, Appellants address Jackson's preservation concerns regarding their second and third issues. Appellants cite Texas Health and Safety Code Section 260A.014(c)(1) to argue that "[t]he retaliation statute on which Jackson bases her claim provides for the recovery of only 'mental anguish' damages." Appellants thus contend that "Jackson's proposed requirement of a broad-form objection does not seem equitable or just." Appellants misstate the law. Section 260A.014(c)(1) does not provide for the recovery of *only* mental anguish damages; rather, that Section provides that a petitioner may recover "the greater of $1,000 or actual damages, including damages for mental anguish even if an injury other than mental anguish is not shown, and damages for lost wages if the petitioner's employment was suspended or terminated." Tex. Health & Safety Code Ann. § 260A.014(c)(1).

14

### 3. Appellants' Fourth Issue as to the Exemplary Damages Awarded Against Granbury SNF and Advanced HCS

In their fourth issue, Appellants argue that the trial court erred by entering a judgment against them for exemplary damages because there is no clear and convincing evidence of reprehensible conduct by them warranting such damages. Jackson contends that Appellants have failed to preserve this issue as to the exemplary damages awarded against Granbury SNF and Advanced HCS. We agree.

Appellants' fourth issue is a complaint regarding the legal sufficiency of the evidence to support the trial court's award of exemplary damages. As we explained above when we addressed Appellants' preservation of their first issue, after a jury trial, a legal-sufficiency challenge may be preserved in one of the following ways: (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or (5) a motion for new trial. *D.T.*, 625 S.W.3d at 75 n.8; *Jimison*, 2024 WL 3282544, at \*8.

Here, Appellants did not raise any complaint in the trial court regarding the award of exemplary damages apart from the contention raised in their motion to modify the final judgment. Even if we construed that motion as a motion for new trial, it only raised a complaint regarding the sufficiency of the evidence to support the trial court's award of exemplary damages against Granbury GS. In their reply brief, Appellants suggest that their motion to modify the final judgment was broader—that

15

it challenged not only the exemplary damages awarded against Granbury GS but also the exemplary damages awarded against Granbury SNF and Advanced HCS. We disagree.

In their motion to modify the final judgment, Appellants requested only that the trial court modify the final judgment by removing the exemplary damages awarded against Granbury GS. Appellants did not ask the trial court to modify the final judgment to remove the exemplary damages awarded against Granbury SNF or Advanced HCS.[11] Thus, Appellants have failed to preserve their fourth issue with respect to the exemplary damages awarded against Granbury SNF and Advanced HCS. *See Banda*, 955 S.W.2d at 272 (holding that the complaint on appeal must be the same as that presented in the trial court); *Tex. Health Harris Methodist Hosp. Fort Worth v. Featherly*, 648 S.W.3d 556, 581 n.25 (Tex. App.—Fort Worth 2022, pet. denied) ("To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the context.").

---

[11]While the motion to modify stated that Jackson "made no . . . showing here of fraud, malice, or gross negligence against any of the named entities," Appellants only requested that the trial court remove the award of exemplary damages against Granbury GS. Indeed, the very next sentence in their motion stated, "As such, the Final Judgment's award of separate exemplary damages as against Granbury GS is inappropriate," and Appellants' prayer requested that the trial court modify the final judgment "by eliminating the exemplary damages award as against Defendant Granbury Rehab & Nursing GS LLC."

16

We overrule Appellants' fourth issue as to the exemplary damages awarded against Granbury SNF and Advanced HCS.

### 4. Appellants' Fifth Issue

In their fifth issue, Appellants argue that the trial court erred by awarding exemplary damages against all of them because the applicable statute—Texas Civil Practice and Remedies Code Section 41.008(b)—provides for, according to Appellants, "one capped amount of punitive damages." *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b). Jackson contends that Appellants have failed to preserve this issue. We agree.

In the jury charge, the jury was asked in Question 5 whether it found by clear and convincing evidence that the harm caused to Jackson resulted from the malice or gross negligence of Appellants, with there being a separate "blank" in the charge for the jury to answer as to each Appellant. In Question 6, the jury was asked to state, should they have answered Question 5 "Yes" as to any Appellant, the amount that should be assessed against that party as exemplary damages, with there being a separate "blank" in the charge for the jury to answer as to each Appellant. The jury answered "Yes" to Question 5 as to all Appellants, and as to Question 6, the jury answered $5,000,000 for Advanced HCS, $2,000,000 for Granbury SNF, and $1,000,000 for Granbury GS.

While Appellants raised certain objections to the jury charge, they did not raise any objections with respect to Questions 5 and 6. Nor did they raise in the trial court

17

the complaint they now make on appeal—that exemplary damages should not have been awarded against each of them because Section 41.008(b) "provides for one capped amount of punitive damages." Thus, because Appellants did not raise the complaint they now make on appeal—at the charge conference or otherwise— Appellants have not preserved their complaint with respect to their fifth issue.[12] *See Featherly*, 648 S.W.3d at 581 n.25 (discussing steps an appellant must take to preserve a complaint for appellate review); *In re S.R.C.*, No. 2-02-426-CV, 2003 WL 22966325, at *2 (Tex. App.—Fort Worth Dec. 18, 2003, no pet.) (mem. op.) ("To preserve an error in the jury charge for our review, the complaining party must timely and plainly make the court aware of the complaint and get a ruling. If a party fails to do this, error is not preserved, and the complaint is waived." (citations omitted)).

Even if Appellants had preserved this complaint, we would nevertheless reject it on the merits. Appellants' fifth issue centers around their contention that Section 41.008(b) "provides for one capped amount of punitive damages." Section 41.008(b) states, "Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of: (1)(A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000." Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b).

---

[12]We note that while Appellants' reply brief addresses Jackson's preservation concerns as to Appellants' first through fourth issues, it does not address Jackson's preservation concerns pertaining to their fifth issue.

In their brief, Appellants acknowledge that "[t]he trial court correctly calculated the amount of the cap—$500,000—based on the amount of non-economic damages found by the jury." Nevertheless, Appellants argue that the trial court erred by holding that each of them was liable for $500,000 in exemplary damages. This is so because, according to Appellants, Section 41.008(b) "does not say that the cap is to be applied to 'each' defendant." Thus, Appellants maintain that the trial court's award of exemplary damages against each of them amounts to "multiple punitive damages awards for the same conduct."

Appellants' view of Section 41.008(b) does not comport with Texas law. In *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, the Texas Supreme Court stated, "[O]ur past decisions make clear that damages caps should be calculated on a 'per defendant' basis." 520 S.W.3d 848, 878 (Tex. 2017). The court went on to state that "exemplary damages are assessed by the jury on a per-defendant basis according to each defendant's culpability." *Id.* Moreover, Texas Civil Practice and Remedies Code Section 41.006, which concerns awards of exemplary damages in actions involving two or more defendants, provides, "In any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant." Tex. Civ. Prac. & Rem. Code Ann. § 41.006. Thus, we reject Appellants' contention that Section 41.008(b) did not authorize the trial court to award exemplary damages against each of them. *See id.*; *Horizon Health Corp.*, 520 S.W.3d at 878; *see also*

19

*Qualicare of E. Tex., Inc. v. Runnels*, 863 S.W.2d 220, 224 (Tex. App.—Eastland 1993, no writ) (holding that "award of exemplary damages against each appellant [was] proper and d[id] not impose a double punishment" in lawsuit brought against individual defendant and the company that employed that individual for tortious acts committed by the individual in the course and scope of her employment with the company).

We overrule Appellants' fifth issue.

## B. Appellants' Remaining Complaints

We now turn to Appellants' remaining complaints.

### 1. Appellants' Fourth Issue as to Granbury GS

In their fourth issue, Appellants argue that the trial court erred by entering a judgment against them for exemplary damages because there is no clear and convincing evidence of reprehensible conduct by them warranting exemplary damages. As noted above, Appellants did not preserve their fourth issue with respect to the exemplary damages awarded against Granbury SNF and Advanced HCS. They did, however, preserve this issue with respect to Granbury GS by complaining in their motion to modify the final judgment about the trial court's award of exemplary damages against Granbury GS, so we will review Appellants' fourth issue on the merits as to that award.

#### a. Standard of Review and Applicable Law

To be entitled to exemplary damages, a plaintiff must prove by clear and convincing evidence that the harm for which she seeks recovery of exemplary

20

damages resulted from the fraud, malice, or gross negligence of the defendant. Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a). "Malice" in this context means "a specific intent by the defendant to cause substantial injury or harm to the claimant." *Id.* § 41.001(7). "Clear and convincing" evidence gives the trier of fact a firm belief or conviction that the allegations sought to be established are true. *Id.* § 41.001(2). This intermediate standard of proof falls between the preponderance standard that applies to most civil proceedings and the reasonable-doubt standard that applies to most criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). Clear and convincing evidence must outweigh evidence that would satisfy the preponderance standard, but it need not be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

To determine if evidence is sufficient under the clear and convincing standard, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020). We assume that the factfinder settled any conflicts in the evidence in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010).

21

Although the trier of fact may draw inferences, those inferences must be reasonable and logical. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021).

### b. Analysis

With respect to this issue, Appellants contend that "there is no evidence that Granbury GS acted at all, let alone acted with the required culpability level to support an award of punitive damages against it." We disagree.

We begin with Appellants' argument that there is no evidence that Granbury GS acted to retaliate against Jackson for reporting abuse at Granbury Villa. In analyzing that argument, we are mindful that the jury was instructed on the concept of a "vice-principal" in Question 5—the question that asked whether exemplary damages should be awarded against Appellants.[13] Under Texas law, a vice-principal is someone

---

[13]That instruction stated,

Advanced Healthcare Solutions, Granbury Rehab & Nursing SNF, and Granbury Rehab & Nursing GS are companies. When a vice[-]principal of a company commits some act, then that act is deemed to be the act of the company itself. A company may have more than one vice-principal. A vice-principal may be an individual or another company. An individual or another company is a "vice-principal" if—

　　1.　that individual or other company has authority to employ, direct, and discharge employees of the company; or

who represents a corporation in its corporate capacity and includes persons who have authority to employ, direct, and discharge servants of the master, and those to whom a master has confided the management of the whole or a department or division of his business. *Off. of Att'y Gen. of Tex. v. Brickman*, 636 S.W.3d 659, 671 (Tex. App.—Austin 2021, pet. denied); *Johnson v. Scott Fetzer Co.*, 124 S.W.3d 257, 267 (Tex. App.—Fort Worth 2003, pet. denied). "Acts of a vice-principal are deemed to be acts of the corporation for purposes of exemplary damages because the vice-principal 'represents the corporation in its corporate capacity.'" *Bennett v. Reynolds*, 315 S.W.3d 867, 883 (Tex. 2010) (quoting *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997)).

Here, the evidence reflected that Jackson was employed by Granbury GS to work at Granbury Villa. Jackson reported to Willmeth, an employee of Granbury SNF. Willmeth reported to Mecaskey, an employee of Advanced HCS. Jackson was written-up by Mecaskey in two disciplinary memorandums—ostensibly for her conduct during her interviews of the facility's residents and for a statement that she made to Morton regarding a new CNA—around the same time that Jackson was investigating and reporting on alleged abuse at the facility. Jackson's employment was suspended by Mecaskey, with both Mecaskey and Willmeth signing the suspension document. Jackson's employment was terminated by Willmeth, with both Willmeth and Morton (an employee of Advanced HCS) signing the termination document.

2. the company has confided to that individual or other company the management of the whole or a department or division of its business.

Viewing the evidence in the light most favorable to the challenged finding, a jury could have formed a firm belief or conviction that Advanced HCS (through Mecaskey and Morton) and Granbury SNF (through Willmeth) had the authority to employ, direct, and discharge Jackson, an employee of Granbury GS, or that Granbury GS had confided the management of its business at Granbury Villa to Advanced HCS and Granbury SNF. *See Brickman*, 636 S.W.3d at 671; *Johnson*, 124 S.W.3d at 267. Thus, the jury could have determined that Advanced HCS and Granbury SNF were vice-principals of Granbury GS, and that Granbury GS acted to retaliate against Jackson through them.[14] *See Brown & Root, Inc. v. Moore*, 92 S.W.3d 848, 855 (Tex. App.—Texarkana 2002, pet. denied) (holding that evidence showed that employee was a vice-principal when he had the authority to direct corporation's employees and when corporation confided in him to manage the operation of the business).

We now turn to Appellants' argument that Granbury GS did not have the required culpability level to support an award of exemplary damages against it. We begin by noting that evidence of retaliation alone is not sufficient to support a finding of malice and an award of exemplary damages. *Tesmec USA, Inc. v. Whittington*, No. 10-

---

[14]To that end, it would have been perfectly reasonable for the jury to ask themselves questions such as, "If Advanced HCS and Granbury SNF did not have the authority to suspend and/or terminate the employment of Jackson, then why did they do so?" and "If Granbury GS did not confide the management of its business at Granbury Villa to Advanced HCS and Granbury SNF, then why did Granbury GS allow those entities to suspend and/or terminate the employment of Jackson?"

04-00301-CV, 2006 WL 827849, at *7 (Tex. App.—Waco Jan. 18, 2006, pet. denied) (mem. op.). However, "knowledge by the employer of laws prohibiting retaliation has been found to be some evidence of malice." *Id.* (citing *Ancira Enters., Inc. v. Fischer*, No. 03-03-00498-CV, 2005 WL 1412161, at *28–29 (Tex. App.—Austin June 16, 2005, no pet.)); *see also Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 663 (Tex. 2012) ("[M]alice might also exist when an employer knows the retaliatory firing is unlawful and does it anyway."). Evidence of economic incentive—that money was a factor— can also be sufficient to establish malice in a retaliatory-termination case. *Town Hall Ests.-Whitney, Inc. v. Winters*, 220 S.W.3d 71, 89 (Tex. App.—Waco 2007, no pet.) (first citing *Tesmec USA, Inc.*, 2006 WL 827849, at *7; and then citing *Whole Foods Mkt. Sw., L.P. v. Tijerina*, 979 S.W.2d 768, 780 (Tex. App.—Houston [14th Dist.] 1998, pet. denied)).

Here, Mecaskey testified that she knew that it was illegal to retaliate against an employee for reporting abuse. Moreover, both Mecaskey and Willmeth signed a "Code of Conduct Receipt Certification and Training Acknowledgement," in which they indicated that an "employee has a cause of action against a facility, its owner(s), or employee(s) if he/she is terminated, disciplined, or discriminated or retaliated against" as a result of "[r]eporting to the employee's supervisor, the administrator, DHS, or a law enforcement agency a violation of law, including a violation of laws or regulations regarding nursing facilities" or for "initiating or cooperating in any

25

investigation or proceeding of a Governmental entity relating to care, services, or conditions at the nursing facility."

Further, Morton testified that she would have expected the State to have designated Granbury Villa as "either priority one or immediate jeopardy status" as a result of the allegations of abuse reported on December 19–20. Morton explained that "priority one" involved the State investigating a facility for abuse and "immediate jeopardy status" involved when the State had determined there was "potential for actual harm." Morton testified that the consequences for a skilled nursing facility being placed in "immediate jeopardy status" included "significant daily fines" and the removal of the facility's license for Medicare and Medicaid beds. She also stated that a facility could be shut down if placed in "immediate jeopardy status."

Viewing the evidence in the light most favorable to the challenged finding, a jury could have formed a firm belief or conviction that the harm caused to Jackson was caused by Granbury GS's malice against Jackson by suspending and terminating her employment because of her investigation into and reporting of abuse at Granbury Villa, actions that a reasonable juror could have inferred would have violated Jackson's legal rights and benefited Granbury GS financially. *See Alleyton Res. Co. v. Ball*, No. 14-19-00816-CV, 2021 WL 2252232, at *1, *12 (Tex. App.—Houston [14th Dist.] June 3, 2021, pet. denied) (mem. op.) ("We conclude this evidence would enable a reasonable juror to infer a firm belief or conviction that [the appellant] was subjectively aware that retaliating against [the appellee] for instituting a workers'

26

compensation proceeding would violate his legal rights, yet it proceeded with conscious indifference to that risk."); *Town Hall Ests.-Whitney, Inc.*, 220 S.W.3d at 89 (holding that reasonable jurors could have credited evidence that facility was "subjected to sanctions and penalties as a result of the report to DHS" and that "they terminated Cathy's employment in an attempt to avoid having to report it because they feared the financial repercussions from a DHS investigation" was some evidence to support jury's malice finding); *Tesmec USA, Inc.*, 2006 WL 827849, at \*7 (holding that evidence was legally sufficient to support the jury's finding of malice when employer's representatives acknowledged that they were aware that it was against the law to retaliate against an employee for filing a workers' compensation claim and there was evidence of retaliation).

We overrule Appellants' fourth issue as to the trial court's award of exemplary damages against Granbury GS.

### 2. Appellants' Sixth Issue

In their sixth issue, Appellants argue that the trial court erred by awarding contingent appellate attorney's fees because the evidence is legally insufficient to support such an award.[15]

---

[15]Because that award was made following a bench trial regarding such fees, Appellants may challenge the legal sufficiency of the evidence to support the award for the first time on appeal. *See* Tex. R. App. P. 33.1(d).

### a. Standard of Review and Applicable Law

When reviewing a trial court's award of attorney's fees, an appellate court must ensure that the record contains sufficient evidence to support such an award. *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 354 (Tex. 2020) (*Yowell II*);[16] *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 505 (Tex. 2019). The party seeking attorney's fees bears the burden of proof. *Yowell II*, 620 S.W.3d at 354; *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 762–63 (Tex. 2012). If there is insufficient evidence in the record to uphold the trial court's award of those fees, the appellate court must reverse. *Yowell II*, 620 S.W.3d at 354; *El Apple I, Ltd.*, 370 S.W.3d at 763–64.

A trial court may award conditional appellate attorney's fees. *See Yowell II*, 620 S.W.3d at 354–56. These are "essentially an award of fees that have not yet been incurred and that the party is not entitled to recover unless and until the appeal is resolved in that party's favor." *Ventling v. Johnson*, 466 S.W.3d 143, 156 (Tex. 2015). While the lodestar method is often used for calculating attorney's fees, *see Rohrmoos Venture*, 578 S.W.3d at 498–502, "that method does not work for conditional appellate attorney's fees that have not yet been incurred and can only be projected based on an expert's opinion testimony." *Trujillo v. Shafaii Invs., Ltd.*, No. 01-22-00819-CV, 2024 WL 2001612, at *10 (Tex. App.—Houston [1st Dist.] May 7, 2024, pet. denied) (mem. op. on reh'g) (citing *Yowell II*, 620 S.W.3d at 355); *see Porter v. Porter*, No. 04-20-00229-

---

[16]We will refer to *Yowell I—Yowell v. Granite Operating Co. (Yowell I)*, 557 S.W.3d 794, 808 (Tex. App.—Amarillo 2018), *aff'd in part, rev'd in part*, *Yowell II*, 620 S.W.3d at 356—later in the opinion.

CV, 2021 WL 2117923, at *4 (Tex. App.—San Antonio May 26, 2021, no pet.) (mem. op.) ("Because an award of conditional appellate attorney's fees depends on the outcome of the appeal and is not a final award until an appellate court issues its final judgment, the full evidentiary requirements of *Rohrmoos* are not implicated."). The hypothetical nature of such fees, however, "does not excuse a party seeking to recover contingent appellate fees from the need to provide opinion testimony about the services it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services." *Yowell II*, 620 S.W.3d at 355.

### b. The Bench Trial on Contingent Appellate Attorney's Fees

Here, following the jury trial, the trial court conducted a bench trial on the issue of contingent appellate attorney's fees.[17] At that trial, David Wiley, one of Jackson's attorneys, testified regarding Jackson's appellate attorney's fees. Wiley's testimony established his qualifications to give an opinion on such fees and provided evidence of his hourly rate. Wiley also testified regarding the stages of the appellate process. He stated that the first stage is "representation through the Court of Appeals"; the next stage is the "petition for review stage" with the Texas Supreme Court; the next stage is the "merits briefing stage" with the Texas Supreme Court; and the final stage is "[o]ral argument and completion of proceedings" in the Texas Supreme Court.

---

[17]The transcript from that bench trial is ninety-two pages.

Wiley testified that he spoke with an "appellate specialist," D. Todd Smith, regarding the reasonable amount of hours needed for handling an appeal. Based on that conversation, Wiley estimated that it would take 215 hours to handle the appeal to the court of appeals; sixty-five hours "for doing the briefing on a petition for review" to the Texas Supreme Court; seventy-five hours for the "merits briefing stage" with the Texas Supreme Court; and forty-five hours for handling the oral argument and "completion of proceedings" in the Texas Supreme Court, which he stated would include things "[l]ike motions for rehearing if someone loses." Based on those projected hours and his hourly rate of $700, Wiley testified that Jackson's anticipated appellate attorney's fees were $150,500 for handling the appeal to the court of appeals; $45,500 for handling the petition for review to the Texas Supreme Court; $52,500 for handling the merits briefing to the Texas Supreme Court; and $31,500 for handling the oral argument and completion of proceedings with the Texas Supreme Court.

Wiley also testified that the agreement between Jackson and his firm was a "contingency fee arrangement." Wiley explained that courts routinely use a multiplier[18] when calculating attorney's fees involving such arrangements, due to the

---

[18]A multiplier is an adjustment made by a court to move the base lodestar amount either up or down. *See El Apple I, Ltd.*, 370 S.W.3d at 760 ("The court may then adjust the base lodestar up or down (apply a multiplier), if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case."); *Dillard Dep't Stores, Inc. v. Gonzales*, 72 S.W.3d 398, 412 (Tex. App.—El Paso 2002, pet. denied) ("The lodestar figure may then be adjusted for factors known as multipliers,

"contingency nature of the representation and the uncertainty of collection." *See Stratton v. XTO Energy Inc.*, No. 02-10-00483-CV, 2012 WL 407385, at *9 (Tex. App.—Fort Worth Feb. 9, 2012, no pet.) (mem. op.) ("We also note that Texas courts consistently allow the use of a multiplier based upon the contingent nature of a fee under Texas statutes allowing recovery of attorney's fees.").

Jackson also called attorney Brian Sanford to testify regarding Jackson's contingent appellate attorney's fees. Sanford testified regarding his experience handling appellate matters. He stated that he had listened to Wiley's testimony regarding the number of hours expected for Jackson's attorneys to represent her in the various stages of the appellate process, and he opined that said number of hours was "reasonable and what [he] would expect to have to work on as an appellate lawyer." Sanford also opined that the hourly rate of $700 for Jackson's attorneys was reasonable and "on the low end" given their ability, experience, and reputation.

At the conclusion of the bench trial, the trial court stated,

> Based on all of the testimony that I've heard today, I'm going to set the reasonable attorney fee rate on the contingent appellate fees at $1,000 per hour. And I'm going to find that the hours that were estimated are reasonable hours, which would be—correct me if I'm wrong, but 215 hours at the Court of Appeals; on step two, 65 hours for petition for discretionary review; step three, 75 hours on merits to the Supreme Court; and four would be oral arguments and miscellaneous potentially, which would be 45 extra hours.

including the complexity of the case, the skill of the attorney, whether the fee is contingent, and the novelty of the issues raised.").

31

So that's the amount that I'm going to say is reasonable and necessary fees for contingent appellate fees in this case.

In the final judgment, the trial court awarded the following contingent appellate attorney's fees: $215,000 for representation for an appeal in the court of appeals (calculated at $1,000 multiplied by 215 hours), $65,000 for representation at the petition for review stage in the Texas Supreme Court (calculated at $1,000 multiplied by sixty-five hours), $75,000 for representation at the merits briefing stage in the Texas Supreme Court (calculated at $1,000 multiplied by seventy-five hours), and $45,000 for representation through oral argument and the completion of post-oral-argument proceedings in the Texas Supreme Court (calculated at $1,000 multiplied by forty-five hours).

### c. Analysis

In their brief, Appellants contend that the evidence is legally insufficient to support the trial court's award of contingent appellate attorney's fees. Specifically, Appellants point to *Yowell II* and argue that Jackson did not offer any testimony regarding the services that would be necessary to defend the appeal to the court of appeals, maintaining that the "only testimony" offered by Jackson at the bench trial "was the conclusion that an appeal to [the court of appeals] would require about 215 hours."

In *Trujillo*, the Houston First District Court of Appeals recently discussed the issue of what specificity is required by *Yowell II* to provide evidence regarding the

32

services needed to defend an appeal. 2024 WL 2001612, at *11–13. In that case, the appellant argued that the appellee's attorney's fee affidavit "did not provide sufficient evidence to support the amount of conditional appellate attorney's fees" because it "[d]id not describe the specific services that would be necessary to defend an appeal." *Id.* at *11. The subject affidavit provided, in pertinent part,

> [I]n my opinion, . . . a reasonable attorney's fee for an appeal to the court of appeals would be $5,000.00. If a petition for review is filed in the Texas Supreme Court, in my opinion, a reasonable additional attorneys' fee would be $2,500.00. If the Texas Supreme Court grants the petition for review, in my opinion, a reasonable additional attorneys' fee could be $3,500.00. My hourly rate is $480.00 and [my co-counsel's] hourly rate is $330.00.

*Id.* at *12.

In analyzing the sufficiency of that affidavit, the court of appeals began its analysis by noting that the affidavit "separates the amounts necessary for an appeal to the intermediate court of appeals and to the Supreme Court and states the attorneys' rates for their services." *Id.* The court acknowledged that "[a]lthough some attorney's fee affidavits identify particular services involved in an appeal, all appeals involve researching, preparing, and drafting a brief, so remanding this case for a more specific description of particular services would provide little if any benefit." *Id.*; *see QJD Peking Duck Rest., Inc. v. TCP Spectrum Partners, Ltd.*, No. 01-22-00545-CV, 2023 WL 5436907, at *4 (Tex. App.—Houston [1st Dist.] Aug. 24, 2023, no pet.) (mem. op.) (affirming award of appellate attorney's fees based on attorney's opinion of reasonable fee for "researching, preparing, and drafting a brief" to the court of appeals and to the

33

Texas Supreme Court and attorney's testimony regarding her hourly billing rate). The court also stated that "unlike the lodestar method, the standard described in *Yowell* [*II*] for conditional appellate attorney's fees does not require an attorney's testimony to describe the number of hours required to perform particular services or the identity of the attorney performing the particular services." *Trujillo*, 2024 WL 2001612, at *12.

The court then turned to *Yowell II* to assess whether the affidavit before it was "at least as specific as the testimony the [Texas] Supreme Court affirmed in *Yowell* [*II*]." *Id.* (citing *Yowell II*, 620 S.W.3d at 356). The affidavit reviewed by the Texas Supreme Court in *Yowell II* was detailed in *Yowell I*. *See Yowell I*, 557 S.W.3d at 808. That affidavit provided, in pertinent part, the appellees' attorney's statement that,

> in his opinion, $22,000 would be a reasonable fee for handling the case through an appeal to this Court; $7,500 would be a reasonable fee for handling a petition for review to the Supreme Court; $9,000 would be a reasonable fee for briefing on the merits; and $5,000 would be a reasonable fee for representation through oral argument and completion of proceedings in the Supreme Court.

*Trujillo*, 2024 WL 2001612, at *12 (quoting *Yowell I*, 557 S.W.3d at 808). The court of appeals in *Yowell I* affirmed the trial court's award of conditional appellate attorney's fees based on that affidavit. *Id.* (citing *Yowell I*, 557 S.W.3d at 809). The Texas Supreme Court then "independently reviewed the record" in *Yowell II*, and it affirmed the court of appeals' judgment on the issue of attorney's fees. *Yowell II*, 620 S.W.3d at 355–56.

34

With that backdrop in mind, the court of appeals in *Trujillo* held that "if the evidence supporting conditional appellate attorney's fees in *Yowell* [*II*] was sufficient, the uncontroverted evidence offered in [the case before it] is likewise sufficient to support the fee award." *Trujillo*, 2024 WL 2001612, at *13. "In claiming otherwise, [the appellant was arguing] that more evidence is required than what the [Texas] Supreme Court actually required in *Yowell* [*II*]." *Id.*

Turning back to our case, we think that the evidence presented by Jackson regarding the services necessary to defend her appeal is at least as strong—if not stronger than—the evidence presented in *Yowell II* and *Trujillo*. Here, Wiley testified regarding the various stages of the appellate process, and he described some of the services for those stages, such as "doing the briefing on a petition for review" and handling things "[l]ike motions for rehearing if someone loses." Unlike the subject affidavits in *Yowell II* and *Trujillo*—which just provided a total amount of fees for each stage of the appellate process—here, Wiley opined about not only the total amount of fees expected for each stage but also the total amount of attorney's hours anticipated for each stage. He was able to estimate those hours after he spoke to an "appellate specialist" regarding the reasonable amount of hours needed for handling an appeal. Wiley also testified regarding his hourly rate, in addition to testifying about the multiplier to be used for his firm's "contingency fee arrangement" with Jackson.

Therefore, we hold that the evidence is legally sufficient to support the trial court's award of contingent appellate attorney's fees. *See Yowell II*, 620 S.W.3d at 354–

35

55; *Trujillo*, 2024 WL 2001612, at \*11–13; *see also Johnson v. Bearfoot Cos., LLC*, No. 02-23-00366-CV, 2024 WL 2202033, at \*10 (Tex. App.—Fort Worth May 16, 2024, no pet.) (mem. op.) (holding that attorney's affidavit that set forth the attorney's hourly rate and opined regarding the total anticipated costs of an appeal was sufficient to support the trial court's award of contingent appellate attorney's fees); *Lakeway Psychiatry & Behav. Health, PLLC v. Brite*, 656 S.W.3d 621, 640 (Tex. App.—El Paso 2022, no pet.) (holding that evidence was sufficient to support award of contingent appellate attorney's fees when counsel testified regarding his reasonable hourly rate and "testified to the amounts requested for each stage in the appeal with the Court of Appeals and with the Texas Supreme Court, differing between appellate services such as briefing and oral argument"); *Eichhorn v. Eichhorn*, No. 03-20-00382-CV, 2022 WL 1591709, at \*14–15 (Tex. App.—Austin May 20, 2022, no pet.) (mem. op.) (holding that evidence was sufficient to support award of contingent appellate attorney's fees when counsel testified regarding his hourly rate and testified about the fees likely to be incurred at five different stages of the appellate process).

We overrule Appellants' sixth issue.

## IV. CONCLUSION

Having overruled Appellants' six issues, we affirm the trial court's judgment.

/s/ Dana Womack
Dana Womack
Justice

Delivered: March 13, 2025